**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 15-4319**

───────────────

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

   v.

ZACHARY M. FOSTER,

        Defendant - Appellant.

───────────────

Appeal from the United States District Court for the Northern District of West Virginia, at Wheeling.  John Preston Bailey, District Judge.  (5:14-cr-00046-JPB-JES-1)

───────────────

Argued:  January 28, 2016         Decided:  May 24, 2016

───────────────

Before WILKINSON, DIAZ, and THACKER, Circuit Judges.

───────────────

Affirmed by published opinion.  Judge Diaz wrote the opinion, in which Judge Wilkinson and Judge Thacker joined.  Judge Wilkinson wrote a separate concurring opinion.

───────────────

**ARGUED:** Brendan S. Leary, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Wheeling, West Virginia, for Appellant.  Tara Noel Tighe, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.  **ON BRIEF:** William J. Ihlenfeld, II, United States Attorney, Stephen L. Vogrin, Assistant United States Attorney, Donald M. Kersey, Law Student, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

DIAZ, Circuit Judge:

Zachary Foster entered a conditional guilty plea to being a prohibited person in possession of a firearm, reserving the right to challenge the district court's denial of his motion to suppress evidence recovered after a stop-and-frisk. Foster argues that the district court erred because the police lacked reasonable suspicion. We disagree and therefore affirm.

I.

A.

Around 12:39 a.m. on August 11, 2014, police in Wheeling, West Virginia, received a "911 hangup-only call" reporting a gunshot near a jogging trail by Coleman's Fish Market.[1] J.A. 68. Officers Eric Burke and Rachel Boyer were dispatched to the scene.

Driving separately, the two officers arrived within minutes to the area in question, which was associated with theft, vandalism, and the production of methamphetamine. With Boyer trailing him, Burke rounded a corner and saw Foster "just standing there, looking around" in an alley between two businesses that, like all others in the area, were closed. J.A.

---

[1] The facts recounted here are consistent with the magistrate judge's findings of fact as well as those of the district court. As noted below in Section II.A, however, Foster presents a different version of events.

When Burke spotted Foster, the officers were about three or four blocks away from Coleman's Fish Market. Foster was the only person Burke and Boyer had encountered since arriving in the area.

Both officers left their cars and approached Foster, with Burke holding a rifle "in the low ready position." J.A. 20. Burke informed Foster that he and Boyer were investigating a report of a shot fired in the area. Foster did not respond and avoided eye contact. Boyer believed that Foster was under the influence of drugs because his eyes "appeared glassy," he did not respond to her or Burke, and "[h]e didn't have the alertness that most people have when police officers approach them." J.A. 71. Burke thought Foster might "possibly" be under the influence of drugs "because of how unresponsive he was." J.A. 41.

Next, Burke asked Foster if he had any weapons. Foster then "began to put his right hand in his right front pocket." J.A. 41–42. Burke and Boyer interpreted this as a "security check"—an instinctual movement in which, upon being asked if they are carrying any weapons, suspects reach to ensure that a concealed weapon is secure. J.A. 42–43, 73.[2] Burke then told

---

[2] Burke learned during his training that a suspect performing a security check presents a potential danger to police officers. Specifically, Burke testified about having (Continued)

3

Foster to keep his hands out of his pockets, and Foster complied. Subsequently, Burke told Boyer to frisk Foster. Boyer first patted the outside of Foster's right pocket, touching an object that felt like a firearm. Ultimately, Boyer discovered three guns.

B.

Foster was indicted for one count of being a prohibited person in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2). Arguing that he was stopped and frisked without reasonable suspicion, Foster moved to suppress the evidence that Boyer and Burke recovered.

After a hearing, a magistrate judge recommended that the district court grant Foster's motion. The judge reasoned that the following factors together did not create reasonable suspicion sufficient to justify the stop-and-frisk:

> (1) Defendant was spotted in the area where a 911 caller reported that one shot was recently fired; (2) the gunshot was reported late at night and the area was considered a "high-crime" area by the officers; (3) Defendant did not respond to any questions by the officers; (4) the officers believed Defendant was under the influence of illegal drugs; and (5) during questioning, Defendant moved his right hand toward his front right pocket.

J.A. 103.

---

watched video footage showing a suspect who, upon being asked if he had any weapons, performed a security check, retrieved a firearm, and shot and killed an officer. See J.A. 42–43.

4

Upon the government's objection, the district court declined to adopt the magistrate judge's report and recommendation and denied Foster's motion to suppress. The court placed particular emphasis on the security check, noting that "[b]ecause the underlying principle for a Terry[3] frisk is officer safety, this Court finds the defendant's hand movements to be especially significant." J.A. 145.

The court, however, gave no weight to the officers' observation that Foster may have been under the influence of drugs because Burke—the officer who ordered the stop-and-frisk—testified merely that Foster "possibly" appeared to be intoxicated. J.A. 138-40. Additionally, the court "g[ave] little weight to [Foster's] lack of eye contact with the officers" because he "did not show signs of nervousness, but [rather] stood there silently." J.A. 141.

Subsequently, Foster entered a conditional guilty plea, reserving the right to appeal the district court's denial of his motion to suppress. Foster was sentenced to thirty months' imprisonment to be followed by three years of supervised release.

This appeal followed.

---

[3] Terry v. Ohio, 392 U.S. 1 (1968).

5

II.

On appeal of "the denial of a motion to suppress, we review the district court's factual findings for clear error and its legal conclusions de novo," United States v. Green, 740 F.3d 275, 277 (4th Cir. 2014), as long as the relevant issues were properly raised in the district court, see Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 731–32 (1993). Because the government prevailed below, "[w]e construe the evidence in the light most favorable to [it]." Green, 740 F.3d at 277.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. "Although brief encounters between police and citizens require no objective justification," United States v. Black, 707 F.3d 531, 537 (4th Cir. 2013), "a brief investigatory stop is impermissible unless the officer's action is supported by a reasonable and articulable suspicion . . . that criminal activity 'may be afoot,'" United States v. Bumpers, 705 F.3d 168, 171 (4th Cir. 2013) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)).

An antecedent question to whether an investigatory stop comports with the Fourth Amendment is whether there was such a stop at all—that is, whether the police "seized" a suspect. Black, 707 F.3d at 537; see also United States v. Slocumb, 804

6

F.3d 677, 681 (4th Cir. 2015). To determine this, we consider whether, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Slocumb, 804 F.3d at 681 (quoting United States v. Gray, 883 F.2d 320, 322 (4th Cir. 1989)).

If a person was seized, courts move on to consider whether the seizure was justified by reasonable suspicion. "Th[is] level of suspicion must be a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" Black, 707 F.3d at 539 (quoting United States v. Griffin, 589 F.3d 148, 152 (4th Cir. 2009)).

To determine if the officer had reasonable suspicion, courts look to "the totality of the circumstances." Slocumb, 804 F.3d at 682. While "a mere 'hunch' is insufficient," reasonable suspicion is less demanding than probable cause "and may well 'fall[] considerably short of satisfying a preponderance of the evidence standard.'" United States v. Massenburg, 654 F.3d 480, 485 (4th Cir. 2011) (alteration in original) (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)). Seemingly innocent factors, when viewed together, can amount to reasonable suspicion. See Slocumb, 804 F.3d at 682. That said, we are skeptical of "Government attempts to spin . . . largely mundane acts into a web of deception." See United States v. Foster, 634 F.3d 243, 248 (4th Cir. 2011).

7

Accordingly, "the Government cannot rely upon post hoc rationalizations to validate those seizures that happen to turn up contraband." Id. at 249.

Even if an investigatory stop is justified by reasonable suspicion, a subsequent frisk of a suspect for weapons is not necessarily permissible. United States v. Sakyi, 160 F.3d 164, 169 (4th Cir. 1998) (explaining "that an officer must have justification for a frisk or a 'pat-down' beyond the mere justification for the traffic stop"). Instead, a frisk must be supported by "reasonable suspicion that the [suspect] is armed and dangerous." United States v. George, 732 F.3d 296, 299 (4th Cir. 2013) (quoting Arizona v. Johnson, 555 U.S. 323, 327 (2009)); see also Terry, 392 U.S. at 24.

On appeal, Foster presents two principal arguments. The first is that he was seized before he reached for his right pocket and that this seizure was not supported by reasonable suspicion. Foster's second argument is that even if he were seized after he reached for his pocket, the police still lacked reasonable suspicion to stop him. We address these arguments in turn.

A.

Before us, Foster argues that he was seized before he reached for his pocket and that this supposed seizure was not justified by reasonable suspicion. We reject this contention.

Foster's legal theory relies on a version of the facts that differs from the findings of the magistrate judge and district court. Foster says that after Burke informed him that there was a gunshot reported in the area, the officers told him that he would be detained and frisked. According to Foster, only after this did he reach for his right pocket upon being asked if he was carrying any weapons.

In pressing this version of the facts, Foster relies on a portion of Boyer's testimony from the motion-to-suppress hearing. Appellant's Br. at 2–3 (quoting J.A. 71). After testifying that Burke told Foster that the police were responding to a report of a shot fired in the area, Boyer stated, "At that point we told Foster that we were going to detain -- we were just going to pat him down to see if he had weapons on him, because he was the only person in the area at the time and all the businesses were closed." J.A. 71. Then, Boyer testified that the police asked Foster if he was carrying weapons "at a later time." J.A. 71. Because the parties agree that Foster reached for his right pocket after being asked if he was carrying any weapons, this portion of Boyer's testimony suggests that the police ordered Foster to submit to a stop-and-frisk before he reached for his pocket.

Based on this excerpt of Boyer's testimony, Foster argues that when the officers told him that they were going to detain

9

him and pat him down, he was subject to an investigatory stop. Because this took place before Foster reached for his right pocket, his security check would not be considered in a reasonable-suspicion analysis.

Foster, however, failed to make this argument in the district court. Instead, Foster accepted the version of the facts ultimately found by the magistrate judge and the district court and effectively conceded that the security check was a relevant consideration by including it in his reasonable-suspicion analysis. Indeed, Foster stated in his response to the government's objections to the magistrate judge's report and recommendation that "[t]he basic facts of this case are not in dispute," and he described the relevant facts in the following sequence: the officers asked Foster if he had weapons, Foster reached toward his pocket, and then the officers ordered him to put his hands in front of him and conducted the pat down. J.A. 125.

A theory presented for the first time on appeal is generally considered waived or forfeited. See United States v. Robinson, 744 F.3d 293, 298–300 (4th Cir. 2014) (discussing waiver and forfeiture); United States v. Rendelman, 641 F.3d 36, 43 (4th Cir. 2011) ("An appellate contention that was not preserved in the trial court is reviewed for plain error only."). Curiously, however, the government has not pressed

10

waiver or forfeiture on appeal.  See United States v. Palomino-Coronado, 805 F.3d 127, 130 n.3 (4th Cir. 2015) (holding that "the government waived its waiver argument").  Accordingly, we think it fair to proceed by determining if the district court clearly erred in failing to find facts consistent with the version of events that Foster presents on appeal.

"Clear error is demonstrated . . . when the reviewing court, considering all of the evidence, 'is left with the definite and firm conviction that a mistake has been committed.'"  United States v. Jackson, 728 F.3d 367, 372 (4th Cir. 2013) (quoting United States v. Breza, 308 F.3d 430, 433 (4th Cir. 2002)).  But, "'[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety,' we will not reverse the district court's finding simply because we have become convinced that we would have decided the fact[s] differently."  United States v. Stevenson, 396 F.3d 538, 542 (4th Cir. 2005) (first alteration in original) (quoting Anderson v. Bessemer City, 470 U.S. 564, 573 (1985)). We also, as previously noted, review the facts in the light most favorable to the government because it prevailed below.  Green, 740 F.3d at 277.

A district court commits clear error "when it makes findings 'without properly taking into account substantial evidence to the contrary.'"  United States v. Francis, 686 F.3d

11

265, 273 (4th Cir. 2012) (quoting Miller v. Mercy Hosp., Inc., 720 F.2d 356, 361 (4th Cir. 1983)). Here, however, the portion of Boyer's testimony to which Foster refers is not the sort of "substantial evidence to the contrary" that must be explicitly accounted for by the district court. Indeed, neither party thought it significant enough to bring to the court's attention. Moreover, as the government points out, the officers' incident reports, Burke's testimony, and Boyer's testimony viewed as a whole all support the district court's findings.[4] Accordingly, we reject Foster's version of the facts as well as his accompanying legal argument that he was seized before he reached for his pocket.[5]

---

[4] See United States v. Caporale, 701 F.3d 128, 140-42 (4th Cir. 2012)(explaining that the district court's failure to address a particular piece of insubstantial contrary evidence did not amount to clear error in light of the whole record); Holton v. City of Thomasville Sch. Dist., 490 F.3d 1257, 1263 (11th Cir. 2007) (per curiam) ("[T]he district court may examine the record as a whole and need not respond to every piece of conflicting evidence.").

[5] Foster also argues that the police were going to detain him from the moment they approached him because he was the only person they saw in the area. Even if true (and the record suggests otherwise), an officer's subjective intent in conducting a Terry stop is irrelevant. Whren v. United States, 517 U.S. 806, 812-13 (1996); United States v. Branch, 537 F.3d 328, 337 (4th Cir. 2008).

B.

We next consider Foster's argument that even if Burke and Boyer stopped him after he reached for his pocket, they lacked reasonable suspicion.

There are five relevant factors supporting the presence of reasonable suspicion that Foster was or had been engaged in criminal activity:

(1) The 911 call that reported a gunshot;

(2) Shortly after the officers were dispatched, Foster was the only person they encountered in the area in which the gunshot was reported;

(3) The stop occurred late at night in a part of the city described as a "high crime" area;

(4) Foster did not respond to the officers' questions and avoided eye contact; and

(5) Foster reached for his right pocket after being asked if he was carrying a weapon.

The government also points to the fact that "Officers Burke and Boyer suspected that [Foster] was under the influence of illegal drugs." Appellee's Br. at 8. Like the district court, we give this no weight.

In evaluating the officers' suspicion that Foster was on drugs, the district court explained that courts must not simply aggregate the knowledge of all officers involved in a stop; instead, they should "substitute the knowledge of the instructing officer or officers for the knowledge of the acting

13

officer." J.A. 139 (quoting Massenburg, 654 F.3d at 493). The court found that "no testimony indicates that Officer Boyer communicated her concern to Officer Burke that [Foster] may have been under the influence of drugs." J.A. 139. Thus, only Burke's knowledge was relevant.

With regard to his knowledge, the court explained that Burke merely "thought [Foster] could 'possibly' be under the influence of drugs . . . 'because of how unresponsive he was.'" J.A. 139–40 (quoting J.A. 41). Based on this, the court found that "Officer Burke's report and testimony do not support a finding that he suspected the defendant was under the influence of drugs or alcohol." J.A. 139–40. The district court therefore concluded that it should not consider Foster's suspected drug use in its reasonable-suspicion inquiry. J.A. 140. We find no error in the district court's analysis.

Nonetheless, based on the remaining factors, we conclude that the stop was justified.

### 1.

The first relevant factor is the 911 call. Foster argues that we should discount it in our reasonable-suspicion analysis because it was anonymous and unreliable.

A "'bare-boned,' anonymous tip, standing alone, [is] insufficient to justify a Terry stop." United States v. Elston, 479 F.3d 314, 317 (4th Cir. 2007) (quoting Florida v. J.L., 529

14

U.S. 266, 273–74 (2000)). But, the police may rely on an anonymous tip to establish reasonable suspicion if it is "suitably corroborated" so as to "exhibit[] 'sufficient indicia of reliability.'" J.L., 529 U.S. at 270 (quoting Alabama v. White, 496 U.S. 325, 327 (1990)); Massenburg, 654 F.3d at 486.

By itself, the tip here falls far short of supplying the officers with reasonable suspicion, as our decision in Massenburg makes clear. There, the police received a "vague," anonymous tip that shots were "possibly" fired in a particular area. Massenburg, 654 F.3d at 486. While we noted that the fact that the tipster "disclosed her basis of knowledge" increased the call's reliability, the anonymous report was still insufficiently reliable to support reasonable suspicion absent further corroboration. Id. at 487–88. The tip here is similar, and thus we must determine whether any other circumstances increase its reliability to justify stopping Foster.[6]

---

[6] We cannot be sure that the call in this case was indeed "anonymous." On one hand, it was a "911 hangup-only call," and the police dispatcher "was unable to call the caller back." J.A. 80. On the other hand, dispatch at some point later informed the officers that the caller was one Sarah Wilson. Ultimately, we need not resolve the issue conclusively. Instead, we assume that the call was anonymous and nevertheless conclude that the officers had reasonable suspicion.

2.

We next consider the fact that, minutes after the officers were dispatched, Foster was the only person they encountered in the area in which the gunshot was reported.

In Massenburg, we explained that "when a tip lacks sufficient indicia of reliability, presence in the area identified by the tip does not generate reasonable suspicion." Id. at 487. Similar to Foster, "Massenburg and his companions were the only people encountered" when the police responded to a report of gunshots about fifteen minutes after receiving an anonymous tip. Id. at 482–83, 487. Additionally, like Foster, Massenburg was found four blocks away from the site of the alleged gunfire. Id. at 487. We concluded that the government would need to point to further circumstances to meet the reasonable-suspicion threshold. See id. at 486–88. Here, given the similarity of the facts at hand to Massenburg, we must conclude the same.

3.

Adding to the mix that the officers encountered Foster at night in what they perceived to be a high-crime area also fails to push the needle across the reasonable-suspicion threshold.

Both the high-crime reputation of an area and the late hour of a police encounter can contribute to a finding of reasonable suspicion. See, e.g., Slocumb, 804 F.3d at 682; George, 732

16

F.3d at 300. But here, even when combined with the factors described above, they are insufficient to justify an investigatory stop.

Massenburg, once again, makes this clear. There, in addition to the previously discussed similarities to Foster's case, Massenburg was encountered at night in a high-crime area known for "drug activity as well as random gunfire." Massenburg, 654 F.3d at 482–83. We reasoned that the high-crime reputation of the area "add[ed] little to the anonymous tip" and "d[id] little to support the claimed particularized suspicion as to Massenburg." Id. at 488. Ultimately, we concluded that the officers lacked reasonable suspicion. Id. at 482, 495–96.

Here, the high-crime reputation of the area is of even less value to the government than it was in Massenburg. The area in which the police stopped Foster was not known specifically for gun-related incidents, unlike the area in question in Massenburg. Consequently, we cannot find reasonable suspicion based on the factors discussed thus far.

4.

Next, we address the extent to which Foster's failure to respond to or make eye contact with the officers supports reasonable suspicion.

With respect to Foster's silence, the Supreme Court has said that "when an officer, without reasonable suspicion or

17

probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." Illinois v. Wardlow, 528 U.S. 119, 125 (2000). Thus, a "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." Id. (quoting Florida v. Bostick, 501 U.S. 429, 437 (1991)). Here, because Foster did not have to respond to Burke and Boyer, we do not find his silence significant.

As for Foster's lack of eye contact, we have explained that "while the failure of a suspect to make eye contact, standing alone, is an ambiguous indicator, the evidence may still contribute to a finding of reasonable suspicion." George, 732 F.3d at 301 (citation omitted). We are hesitant, however, to afford lack of eye contact much weight because it is no more likely to be an indicator of suspiciousness than "a show of respect and an attempt to avoid confrontation." See Massenburg, 654 F.3d at 489.

Massenburg is once again instructive. There, the police pointed to the defendant's allegedly suspicious and nervous behavior, namely that he avoided eye contact, stood back from the group of people he was with, and "took a step back away from [a police officer], and . . . then began pantomiming a self pat-

down search."[7]  Id. at 484–85.  We concluded that this behavior was not "[g]enuinely suspicious," but rather a "mild reaction" to requests to consent to a voluntary search.  See id. at 491. Such unremarkable evidence of nervousness could not "suffice[] to create reasonable suspicion" without "Terry's reasonable suspicion requirement [becoming] meaningless."  See id. Accordingly, "it [was] clear that reasonable, particularized suspicion of criminal activity d[id] not exist."  Id.

Here, while Foster's failure to make eye contact with the police is not irrelevant, George, 732 F.3d at 301, it is too "mild" a reaction to deserve much weight in our analysis, especially in light of the district court's finding that Foster did not appear to be nervous, J.A. 141.

Based on the factors discussed thus far, this case is not meaningfully distinguishable from Massenburg.  Accordingly, we turn to consider whether the security check is sufficient to tip the scales in the government's favor.

---

[7] The self-pat-down in Massenburg is unlike the security check in this case.  Massenburg's movements "w[ere] interpreted . . . by [the investigating officer] . . . as an obvious attempt to satisfy [the officer] without consenting to a frisk[;] [the movements] provided little basis, if any, as a matter of constitutional analysis, for a reasonable suspicion of wrongdoing."  654 F.3d at 491; see also id. at 483 (quoting an officer's testimony for his observation that Massenburg "air-patted himself down, . . . trying to show he didn't have anything").

19

5.

A security check by a suspect can contribute to a finding of reasonable suspicion that the suspect was engaged in criminal activity. See United States v. Humphries, 372 F.3d 653, 660 (4th Cir. 2004) (pointing to a security check as a factor supporting a finding of probable cause); see also, e.g., United States v. Briggs, 720 F.3d 1281, 1287-89 (10th Cir. 2013) (explaining that a suspect grabbing at his waistline was relevant to a reasonable-suspicion analysis because it suggested that he might be carrying a weapon); United States v. Oglesby, 597 F.3d 891, 895 (7th Cir. 2010) (finding reasonable suspicion for a frisk where, among other factors, the suspect "repeatedly lowered his right hand toward the right pocket of his pants" because "such action . . . reasonably indicated to the officers that [he] might be carrying a weapon").

Foster argues, however, that his hand motion should carry little or no weight because it merely indicated "that he may or may not [have been] carrying something in his pocket." Appellant's Br. at 22. He points to "other innocent explanations for the movement"; for instance, Foster says he could have been reaching for a cell phone. Id.

While we have no doubt that there are possible innocent explanations for Foster's movement, "it must be rare indeed that an officer observes behavior consistent only with guilt and

20

incapable of any innocent interpretation." United States v. Moore, 817 F.2d 1105, 1107 (4th Cir. 1987) (quoting United States v. Price, 599 F.2d 494, 502 (2d Cir. 1979)); see also Black, 525 F.3d at 365 ("[A] reasonable suspicion need not rule out all innocent explanations . . . ."). Burke and Boyer were investigating a report of a gunshot and the one person they encountered at the scene reached for his pocket when asked if he was carrying a weapon. It was not unreasonable under these circumstances for the officers to have concluded that Foster might have a weapon.

Foster also contends that "West Virginia law allows the open and concealed carry of firearms," so the fact that Foster might have been carrying a firearm did not suggest any evidence of criminal conduct. Appellant's Br. at 22. This argument fails because Burke and Boyer stopped Foster not merely because he might be armed, but because he might have been the source of the reported gunshot.[8]

---

[8] A gunshot at night in a business district of a city can accompany any number of crimes, for instance armed robbery and murder, as well as more minor infractions such as discharging a weapon across a public road, see W. Va. Code § 20-2-58(a)(1) (2014), or "discharg[ing] . . . [a] firearm within the corporate limits of the Municipality [of Wheeling]," see Wheeling, W. Va., Ordinance § 545.11(a). Indeed, after Foster was arrested, the Wheeling Police Department "checked the surrounding area for a possible [gunshot] victim." J.A. 19.

Having established that we can properly include the security check as a factor in our reasonable-suspicion analysis, we now combine all of the factors supporting reasonable suspicion to "consider 'the totality of the circumstances—the whole picture.'" United States v. Smith, 396 F.3d 579, 583 (4th Cir. 2005) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)).

Although the circumstances observed or known by the police before Foster reached for his pocket were not enough to support reasonable suspicion, the security check tied all of the factors into a coherent whole that justified an investigatory stop. Burke and Boyer were investigating a reported gunshot, in a high-crime area, at night. Because Foster was the only person in the area where the gunshot was reported, the police justifiably had some suspicion that he might have been the individual who fired the shot. Indeed, we found reasonable suspicion under similar circumstances in United States v. Moore, though in that case a police officer was responding to a burglar alarm rather than an anonymous 911 call. See 817 F.2d at 1106–07 (concluding that there was reasonable suspicion for a Terry stop where (1) a police officer responded quickly to a silent burglar alarm in a high-crime area at night, (2) the officer saw only the defendant in the area, (3) the defendant was "about 30 to 40 yards" from the building in question, and (4) "[the

22

defendant] was moving away from the scene of the crime, though the silent nature of the alarm may have given him no cause to hurry").

By performing a security check, which suggested that he could be armed, Foster gave the officers further cause to suspect that he was the source of the gunshot. The check also gave the officers an additional reason to trust the 911 caller's report: not only was there a person near the scene of the reported gunshot at an otherwise quiet hour, but there was reason to believe that person was armed. Under the circumstances in which Burke and Boyer found themselves, "the Fourth Amendment d[id] not require [them] . . . to simply shrug [their] shoulders and allow a crime to occur or a [possible] criminal to escape." Id. at 1106 (quoting Adams v. Williams, 407 U.S. 143, 145 (1972)). Instead, they could justifiably perform a Terry stop because they had reasonable suspicion that Foster committed a crime associated with discharging a firearm.

Our decision in United States v. Sims further supports finding reasonable suspicion in this case. 296 F.3d 284 (4th Cir. 2002). There, the police received "an anonymous report that a black male wearing a T-shirt and blue jeans had just fired a pistol" in a particular area. Id. at 285. An officer arrived minutes later and saw a person matching the description in the report standing behind a house "'in a crouched position,'

23

'peeking around the corner,'" who then "'jerk[ed] right back' behind the house" when the officer made eye contact with him. Id. at 285-86 (alteration in original). The officer then stopped the suspect and frisked him. Id. at 286.

The suspect argued that the officer lacked reasonable suspicion under Florida v. J.L., 529 U.S. 266 (2000). Id. In that case, an anonymous tipster reported that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." J.L., 529 U.S. at 268. Police then arrived at the scene and found J.L., who matched the description in the anonymous tip, along with two other people. Id. Other than the tip, "the officers had no reason to suspect any of the three of illegal conduct." Id. The police "did not see a firearm, and J.L. made no threatening or otherwise unusual movements." Id. Nevertheless, the police stopped J.L. and frisked him. Id. The Court concluded that the police lacked reasonable suspicion because outside of the anonymous tip, there was no evidence that J.L. had done anything illegal. Id. at 268, 270-74; see Sims, 296 F.3d at 286 (explaining that in J.L., the Supreme Court held "that the uncorroborated anonymous tip, by itself, did not create the reasonable suspicion of criminal activity necessary to support a search").

We found the facts of Sims distinguishable from J.L. because the Sims defendant engaged in "furtive behavior." Sims,

24

296 F.3d at 286. Accordingly, we concluded that the police had reasonable suspicion based on the defendant's evasive conduct combined with the fact that he "matched the tipster's description, was the only person about, and was a very short distance from the spot where a shot was reportedly fired just a few minutes before." Id. at 287 ("[I]t was [not] unreasonable for an officer to suspect that Sims was the man of whom he had been warned.").[9]

The instant case is similar. In Sims, the defendant's suspicious behavior bolstered the anonymous tip and, once combined with the tip, supported reasonable suspicion. Here, Foster's performance of a security check gave credence to the anonymous tip and gave Burke and Boyer reason "to suspect that

_____

[9] Other cases similarly show that an anonymous tip in conjunction with a suspect's suspicious actions can support a finding of reasonable suspicion. See, e.g., United States v. Mosley, 743 F.3d 1317, 1321, 1328 (10th Cir. 2014) (finding reasonable suspicion where the police responded to an anonymous tip that two individuals had a gun inside their car where (1) there had been previous shootings in the parking lot in which the individuals were found, and (2) one of the passengers made "furtive motions" that the "officers testified were consistent with trying to either hide or retrieve a weapon"); Robinson v. Howes, 663 F.3d 819, 828–31 (6th Cir. 2011) (explaining that a suspect's "evasive behavior" bolstered a reasonable-suspicion finding where the other circumstances included a nearly anonymous 911 call); United States v. Muhammad, 463 F.3d 115, 122–23 (2d Cir. 2006) (finding reasonable suspicion and distinguishing J.L. where an anonymous tip was corroborated by evidence of flight).

25

[Foster] was the man of whom [they] had been warned." Id. This was enough to justify the investigatory stop of Foster.[10]

### III.

For the reasons given, we affirm the district court's judgment.

AFFIRMED

---

[10] While it is not the focus of his brief, Foster also argues that Burke and Boyer violated the Fourth Amendment by frisking him because they lacked reasonable suspicion that he was armed. This argument fails for the same reasons we find the Terry stop justified.

26

WILKINSON, Circuit Judge, concurring:

Poor Terry v. Ohio, 392 U.S. 1 (1968). It has fallen on hard times. A string of recent tragic street encounters involving the police has brought the stop-and-frisk procedure authorized in Terry under fire. But that is nothing new. The Court's authorization of an investigative procedure on a standard less than probable cause came under fire at the time, with Justice Douglas noting in dissent that "[t]he term 'probable cause' rings a bell of certainty that is not sounded by phrases such as 'reasonable suspicion.'" Id. at 37. In fact, the decision was seen by some contemporaries as a capitulation to cries for law and order during the 1968 political season. Again, as Justice Douglas noted, the "hydraulic pressure" on the Court to dilute constitutional guarantees "has probably never been greater than it is today." Id. at 39.

There is truth in this indictment, though the truth is only partial, as truth is often found to be. It is worth recalling the three great purposes animating the Terry decision, because those purposes are present in this case. The first purpose was simple crime prevention -- the need being simply to allow police to conduct an investigatory stop before criminals visit harm upon the innocent. The Terry Court cautioned that "a rigid and unthinking application of the exclusionary rule . . . may exact a high toll in human injury and frustrat[e] efforts to prevent

27

crime." 392 U.S. at 15. Here, as Judge Diaz ably recounts, a gunshot was reported during the early morning hours in the vicinity of an area known for theft, vandalism, and drug activity. J.A. 34-39. When the police arrived on the scene, they found only Foster standing in an alley between two closed businesses. Id. at 40. And after being asked if he had any weapons, Foster "began to put his right hand in his right front pocket." Id. at 41-42. Thus, the crime-preventive stop in this case was justified, for under the totality of the circumstances the officers had reasonable suspicion that criminal acts had been committed or were in the offing.

If Terry's first purpose of crime prevention or detection is more salient at the stop phase of an interaction, the frisk brings into relief the second and third purposes of that decision -- to protect the safety of officers and suspects alike. The Court gave due consideration to the "interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." 392 U.S. at 23. In the present case, the district court found that the officers only frisked Foster after he reached for his pocket in response to being asked whether he was armed. J.A. 145. Of course, before the officers searched Foster they could not have known with certainty what was in his pocket. As Foster claims, he might

28

have been "reaching for his cell phone." Appellant's Br. at 22. But one of the principal aims of Terry was to ensure that in circumstances such as these officers do not have to stand idly by, waiting for a bullet. As Terry put it, "it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the [suspect] is in fact carrying a weapon and to neutralize the threat of physical harm." 392 U.S. at 24

It may seem ironic that a decision broadening police investigatory powers could actually promote the interests of suspects in some circumstances, but that is in fact the case. The third and related purpose of Terry was to protect suspect safety by deescalating police-suspect interactions. True, the point only goes so far. As the Court acknowledged, "[i]n many communities, field interrogations are a major source of friction between the police and minority groups." 392 U.S. at 14 n. 11 (internal quotation marks omitted). The Court feared that suspicionless searches in particular could only aggravate hostilities and fuel resentment. In that way, frisks conducted without reasonable suspicion run the risk of turning what would otherwise be "wholly friendly exchanges of pleasantries or mutually useful information [in]to hostile confrontations of armed men involving arrests, or injuries, or loss of life." Id. at 13.

Among Terry's insights, however, was that a frisk performed under the proper authority might actually help to ease tensions by dispelling suspicion and by removing an incentive for officers to use lethal or disabling force. An officer, like any human being, may be less on edge if the person in his presence is not a threat to shoot. Removing the threat affords greater room for more humane police responses. In that respect, Terry may help to protect suspects as well as the police.

To be sure, even a lawful frisk can be "an annoying, frightening, and perhaps humiliating experience." Id. at 25. But Terry makes clear that as great as the indignity inflicted by that procedure might be, it pales in comparison to the tragic results and inflamed reactions that follow from the use of lethal force. See id. at 13-15. In other words, Terry may actually serve to defuse interactions such as this one if parties are able to communicate with a diminished fear that grievous consequences may result. Whether the confrontation here would have taken a more explosive turn without the frisk is of course impossible to know. All one can say for certain is that no one was wounded or otherwise physically abused, and no loss of life ensued.

Terry was decided in the high days of the Warren Court. Chief Justice Warren himself wrote the opinion for a nearly unanimous tribunal. After Brown v. Board of Education, 347 U.S.

30

483 (1954), <u>Terry</u> and <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), may well be among the Chief Justice's greatest legacies. Those two decisions have come to define the parameters of modern police practice as much as any other case. Although <u>Terry</u> has come under fire both then and now, the case remains good law. It has stood the test of time. As the present case reminds, deservedly so.