**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────

**No. 19-4912**

─────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

TREMAYNE LAMONT DRAKEFORD,

Defendant - Appellant.

─────────

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Max O. Cogburn, Jr., District Judge. (3:18-cr-00238-MOC-DSC-1)

─────────

Argued: January 26, 2021                    Decided: March 26, 2021

─────────

Before GREGORY, Chief Judge, and WYNN and THACKER, Circuit Judges.

─────────

Reversed and remanded by published opinion. Judge Thacker wrote the opinion, in which Chief Judge Gregory and Judge Wynn joined. Judge Wynn wrote a concurring opinion.

─────────

**ARGUED:** Ann L. Hester, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Amy E. Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Anthony Martinez, Federal Public Defender, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. R. Andrew Murray, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

─────────

THACKER, Circuit Judge:

Tremayne Drakeford ("Appellant") was arrested and charged with possession and distribution of controlled substances after police apprehended him at a Car Stereo Warehouse and found narcotics in his sweatshirt pocket. After his arrest, Appellant moved to suppress evidence of the narcotics. The district court denied Appellant's motion, and he pled guilty to the charged crimes.

Appellant appeals the district court's denial of his motion to suppress, arguing that the officers did not have reasonable suspicion to stop and frisk him and violated his Fourth Amendment right to be free from unreasonable search. We agree with Appellant. In order to sustain reasonable suspicion, officers must consider the totality of the circumstances and, in doing so, must not overlook facts that tend to dispel reasonable suspicion. Here, officers relied on general information from a confidential informant; two interactions that officers believed were consistent with the manner in which illegal drugs are bought and sold, but in which no drugs were found; and a single officer witnessing a handshake between Appellant and another man and concluding that it was a hand-to-hand drug transaction, even though the officer did not see anything exchanged. Moreover, the officers concluded this amounted to reasonable suspicion, overlooking the facts that the interaction took place in a public space, in broad daylight, outside of the vehicles, and in front of a security camera; and after the interaction, Appellant went into a store, rather than immediately leaving the scene. On these facts, we agree with Appellant that the officers did not have more than a mere hunch that criminal activity was afoot when they stopped Appellant.

2

Thus, as detailed further herein, we reverse the district court's denial of Appellant's motion to suppress.

## I.

### A.

#### Background Investigation

In August 2017, a confidential informant contacted Detective Douglas Moore advising that a "light skinned black male, heavyset" with "a full beard" was trafficking cocaine and heroin. J.A. 64.[1] The informant provided the suspect's vehicle tags but did not provide a name or address. The informant also never provided detectives with any predictive behavior of Appellant, such as that he was going to sell drugs to her on a particular date. Through further investigation, Detective Moore linked the vehicle tags provided by the informant to Appellant. Once Detective Moore discovered Appellant's identity, he learned that Appellant had been arrested "several times for drugs," but he did not have knowledge of any convictions resulting from such arrests. *Id.* at 65.

Although the informant provided Detective Moore with the tip in August 2017, Detective Moore did not begin further investigation until October 2017. At that point, Detective Moore located an address believed to be associated with Appellant. And, months later, in November and December 2017, Detective Moore conducted surveillance at the identified address. Detective Moore surveilled Appellant's address more than ten times, to no avail. Detective Moore never saw Appellant at that location. Detective Moore then

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

identified a female associate of Appellant. He located her address and began conducting surveillance there. Detective Moore observed Appellant at that residence over 30 times but never witnessed any drug transactions.

1.

On February 1, 2018, Detective Moore surveilled Appellant at the address of his purported female associate. That afternoon, the surveillance team observed Appellant leave the residence and drive to a gas station. At the gas station, Appellant remained in his vehicle until a white pickup truck pulled up and parked next to him. The sole person in the pickup truck got out of his car, entered Appellant's car, and remained in Appellant's car for 30 to 45 seconds before exiting, re-entering his own car, and driving away. At that point, the surveillance team followed the white pickup truck. Detectives believed that the driver got high on drugs after he left the gas station because "he started to speed up and slow down." J.A. 72. As a result, the surveillance team called in local police to pull over the truck. During the traffic stop, a K-9 officer with a dog detected drugs, but officers only found syringes in the vehicle, no drugs. Detective Moore testified that the syringes implied drug use "[b]ecause heroin is cooked and [is then] drawn from some type of apparatus into the syringe and then the syringe is placed inside the user -- in a blood line, in a vein inside the user." *Id.* at 73. Further, Detective Moore testified that it was significant that syringes were recovered from the vehicle "because I felt like the driver was a heroin addict or used heroin and it was significant because he just left visiting with [Appellant]." *Id.*

4

2.

Later that same week,[2] detectives observed Appellant leave the female's residence and travel to a different gas station. At the gas station, Appellant parked and then sat in his car. Nothing else happened. Appellant then left the gas station and returned to the female's residence.

On that same day, Detective Moore contacted the informant and asked her to contact Appellant to ask if Appellant had any heroin to sell, which she did. According to the informant, Appellant told her that he did not have any heroin and that he was waiting for a supply. Later that same day, detectives observed Appellant leave the female's residence and enter another residence. Appellant did not have anything in his possession when he entered the home. A car with a Florida license plate arrived at the home, and a person entered the home carrying several bags. About an hour later, Appellant left the home carrying a bag. Detectives followed Appellant back to the female's residence, and while they were following him, Appellant called the informant to notify her that he had drugs to sell.

B.

Car Stereo Warehouse Stop

Between five and seven days later, on February 9, 2018, around 1:30 in the afternoon, detectives were again surveilling Appellant when they observed him leave the

---

[2] No witness testified as to the specific date this surveillance occurred, but Detective Moore's testimony established that it occurred in the same week as the February 1 incident. Thus, this surveillance would have occurred on February 2, 3, or 4, 2018.

female's residence and drive to Car Stereo Warehouse. Appellant parked his car in the parking lot of Car Stereo Warehouse and remained inside the car. Detective Moore testified that the surveillance team was "expecting someone to meet [Appellant] and this to be like the other occasions when somebody would meet him." J.A. 78. Detective Moore testified that this stop was consistent with how he would expect a drug transaction to occur:

> When a person who is purchasing drugs, a place is selected, a public place is selected typically and -- as a meeting location. And one person will exit their vehicle into the other vehicle. The dope is bought there or sold there, however bought or sold there, and then the person leaves into their vehicle and leaves and the transaction is done. And typically that happens or occurs in the public area.

*Id.* at 71.

Notably, the location where Appellant parked at Car Stereo Warehouse was not in a high crime area, and was directly in front of a security camera. As Detective Moore described it, the location was a "busy area in a public parking lot." J.A. 109. While Appellant was waiting in his car, a white Cadillac pulled up and two black males exited the vehicle. Appellant exited his vehicle at that time. Detective Moore testified that this interaction was "consistent . . . in how [Appellant] meets people in public areas," and stated, "I honestly believed that it was a drug deal was going to happen, a transaction was going to occur." *Id.* at 79.

## 1.

### The Two Handshakes

Detective Moore testified that someone radioed that a "hand-to-hand" money and drug exchange occurred in the Car Stereo Warehouse parking lot between Appellant and

one of the men. J.A. 80. Detective Paul Murphy testified that he first witnessed "a quick dap, quick handshake . . . , some brief conversation." *Id.* at 116. Then, as the men continued talking, they exchanged a second handshake, which Detective Murphy "believed to be a hand-to-hand narcotics transaction." *Id.* at 117. He stated, "At that point there was an exchange of narcotics for money or just an exchange of narcotics just based on the mannerisms of that action." *Id.* But, on cross-examination, when specifically asked if he saw drugs or money exchange hands, Detective Murphy testified that it was just the actions and mannerisms that indicated to him that it was a drug transaction. He did not actually see drugs exchanged. Nor did he see money exchanged. *See* J.A. 120 ("Q. So you didn't see any drugs or money exchange, just the actions and the mannerisms and it being a second handshake and it being longer than the first handshake, you believed it to be a hand-to-hand? A. Yes, sir."). Detective Murphy provided no further detail about why this second handshake led him to conclude that a hand-to-hand drug transaction had occurred. In fact, when asked to describe why he thought the second handshake was a "hand-to-hand transaction versus just another greeting," Detective Murphy testified, only, "Well, the first interaction was brief. The second, what I believe to be the hand-to-hand transaction, was more deliberate and it wasn't as brief as the first action." *Id.* at 118. Like Detective Murphy, no other officer in the surveillance team witnessed drugs or money changing hands.

After the second handshake and supposed "hand-to-hand" exchange, Appellant and his two companions entered the Car Stereo Warehouse. Detective Moore testified that after the radio call about the hand-to-hand exchange, he made the decision that detectives were

7

going to make a stop. Nonetheless, Detective Moore thought that suspicious activity may have been occurring inside the business, so he entered the Car Stereo Warehouse behind the three men. Inside, the men talked to a salesperson about purchasing something and remained in the store for about 10 or 15 minutes. While at the counter, one of the men had a backpack, which was at his feet. When Detective Moore walked past the men at the counter, the man with the backpack "cuff[ed] the bag with his foot and slid[] it closer to him as if he was protecting it." J.A. 82.

After all three men and Detective Moore exited the store, the three men "continu[ed] to meet," and Detective Moore had the uniformed patrol cars enter the parking lot. J.A. 83.

2.

Search

Detectives confronted Appellant in the parking lot when he exited the store and entered his vehicle. They asked him to step outside from the driver's side of his vehicle. Detective Hank Suhr led Appellant to the back of his vehicle where Detective Suhr had Appellant place his hands on the trunk of the vehicle. Detective Suhr told Appellant to remove his hands from his pockets. Detective Suhr testified, "[Appellant's] body language was consistent with not being completely truthful or he appeared to be a little apprehensive." J.A. 205. While Appellant was facing the car with his hands on the trunk,

8

he turned around and removed his hands from the trunk of the car twice. Detectives Suhr and Todd Hepner then proceeded to handcuff Appellant.

Detective Suhr testified that he patted down Appellant's pocket and felt what was immediately apparent to him as narcotics. He pulled a round bag of contraband out of Appellant's left pocket. Appellant contends that Detective Suhr did not pat him down for weapons but, instead, manipulated his pocket in order to feel the bag of drugs. Detective Hepner testified that Detective Suhr did not manipulate the pocket, but "just patted it down real quick." J.A. 135. When describing what he felt in Appellant's pocket, Detective Suhr testified:

> [H]is body language and the way that he kept putting his hands in his pockets, that was the first area that was of my interest. So I kind of tapped there first and then felt a bulge on the left side first and then later on the right side. But the left side was clearly visible that it was hanging lower and that there was something inside that pocket.

*Id.* at 208. Further, Detective Suhr testified, "And [I] just felt, again, through my training and experience, that there was some form of narcotics in that pocket." *Id.* Appellant contends that the body camera footage from Detectives Suhr and Hepner demonstrates that Detective Suhr never made motions consistent with a pat down, but rather, Detective Suhr opened Appellant's pocket, reached in, and pulled out a bag of narcotics.

C.

Motion to Suppress

After the search at the Car Stereo Warehouse, officers executed a search warrant at the female associate's residence and found additional drugs and a firearm. Appellant was

9

indicted and charged with possession with intent to distribute controlled substances including 500 grams or more of cocaine, 50 grams or more of methamphetamine, 100 grams or more of heroin, and marijuana. He was also charged with being a felon in possession of a firearm and possessing a firearm in furtherance of a drug trafficking crime. Appellant filed a motion to suppress the evidence from the Car Stereo Warehouse stop and the evidence found through the search warrant, claiming that the stop was unlawful and the evidence found from the search warrant were the fruits of an unlawful search. After conducting a hearing, the district court denied Appellant's motion to suppress the evidence.

First, the district court held that the officers had reasonable suspicion to conduct an investigatory stop on Appellant. It concluded:

> Based on the information provided by the confidential informant, observations of Defendant during several recent surveillance operations, and Detective Murphy's observation of the hand-to-hand transaction just before detectives approached Defendant, detectives reasonably believed that criminal activity was afoot. Detectives reasonably believed they would find narcotics, money, and/or drug related paraphernalia on Defendant's person.

J.A. 294. Further, the district court held that the detectives' observation of a hand-to-hand transaction, Appellant's "nervous behavior," Appellant's body language, Appellant placing his hands in his pockets, and detectives' knowledge of Appellant's "criminal history and known affiliation with the distribution of narcotics" justified the stop. *Id.* at 295.

The district court also concluded that officers did not exceed the scope of a pat down pursuant to the investigatory stop. Specifically, the district court held:

10

> [B]ody camera footage shows that Detective Suhr properly patted Defendant's outer clothing without manipulating or lingering over any particular area. Detective Suhr's hand can be clearly seen on the left side of Defendant, over the pocket containing the illegal substance, as Defendant continually turned around and refused to follow instructions. Although Detective Suhr stopped briefly during the frisk to detain Defendant due to safety concerns, the video shows that Detective Suhr reached directly into Defendant's pocket immediately thereafter, which corroborated Suhr's claim that the incriminating character of the "ball like substance" had been immediately apparent when he patted Defendant's outer pocket.

J.A. 296. Therefore, the district court denied Appellant's motion to suppress the evidence found on his person.

Thereafter, Appellant pled guilty to all counts and was sentenced to 210 months of incarceration. He timely appealed the district court's ruling on the motion to suppress.

## II.

"We review the district court's legal conclusions — including determinations of reasonable suspicion and probable cause — de novo, and its factual findings for clear error, construing the facts in the Government's favor." *United States v. Brinkley*, 980 F.3d 377, 383 (4th Cir. 2020) (internal citations omitted).

## III.

### A.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures," U.S. Const. amend. IV. "The Fourth Amendment imposes limits on search-and-seizure powers in order to prevent arbitrary and oppressive interference by enforcement officials with the privacy and

11

personal security of individuals." *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976).

"The protection against unreasonable seizures includes brief investigatory stops." *United States v. Curry*, 965 F.3d 313, 319 (4th Cir. 2020) (en banc) (internal quotation marks omitted). In *Terry v. Ohio*, the Supreme Court held that a police officer may conduct a brief investigatory stop based on reasonable, articulable suspicion that criminal activity is afoot. *See* 392 U.S. 1, 30 (1968); *Curry*, 965 F.3d at 320. But in a *Terry* stop, "[an] officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry*, 392 U.S. at 21. "The level of suspicion must be a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Black*, 707 F.3d 531, 539 (4th Cir. 2013) (quoting *United States v. Griffin*, 589 F.3d 148, 152 (4th Cir. 2009)). "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches." *Terry*, 392 U.S. at 22.

"To determine if the officer had reasonable suspicion, courts look to the totality of the circumstances." *United States v. Foster*, 824 F.3d 84, 89 (4th Cir. 2016) (internal quotation marks omitted). "Seemingly innocent factors, when viewed together, can amount to reasonable suspicion." *Id.* But, "the presence of additional facts might dispel reasonable suspicion." *Kansas v. Glover*, 140 S. Ct. 1183, 1191 (2020). "[W]e are skeptical of Government attempts to spin . . . largely mundane acts into a web of deception." *Foster*, 824 F.3d at 89 (internal quotation marks omitted). "Accordingly, the

Government cannot rely upon post hoc rationalizations to validate those seizures that happen to turn up contraband." *Id.* (internal quotation marks and citations omitted).

B.

The Government argues that the officers had reasonable suspicion to conduct an investigatory stop on Appellant for several reasons: (1) a confidential informant provided information that Appellant trafficked cocaine and heroin; (2) officers witnessed what they believed to be a drug transaction in a gas station parking lot, after which they found syringes in the truck that was part of the purported drug transaction; (3) officers witnessed Appellant arrive at a second gas station and wait in his car; (4) officers witnessed Appellant enter a home empty handed, leave carrying bags, and subsequently inform the confidential informant that he had drugs to sell; and (5) Detective Murphy believed he witnessed a "hand-to-hand" transaction when Appellant engaged in a second handshake in the Car Stereo Warehouse parking lot.

Appellant, on the other hand, argues that officers relied only on generalized information from the confidential informant rather than specific, predictive information. Further, Appellant contends that officers interpreted Appellant's innocent conduct -- such as the second handshake -- as a drug transaction. Finally, Appellant argues that officers ignored facts that refuted officers' suspicions: (1) officers did not witness a drug transaction either time they observed Appellant at a gas station; (2) officers did not locate drugs in the white pickup truck they followed; (3) Appellant and the two men entered the Car Stereo Warehouse and shopped for a car stereo; (4) the alleged transaction occurred in broad daylight in a public parking lot; (5) the alleged transaction occurred directly in front of a

13

security camera; (6) no officer saw either drugs or money exchange hands during the alleged transaction.

Based on the totality of the circumstances, Appellant has the better argument.

1.

Throughout the investigation of Appellant, officers relied on information provided by a confidential informant. This court has previously noted, "[T]ips fall somewhere on a spectrum of reliability, and under the Fourth Amendment a reviewing court may—indeed must—take into account all the facts surrounding a tip in assessing the totality of the circumstances supporting a stop." *United States v. Perkins*, 363 F.3d 317, 324 (4th Cir. 2004). Here, officers' testimony on the reliability of the confidential informant is scant. When asked how many cases the informant had assisted with, Detective Moore testified, "Approximately 50." J.A. 92. However, Detective Moore never opined on the number of convictions the informant aided in, if any, or any other facts that credit the reliability of the informant.

Here, the informant provided two pieces of information about a person who was allegedly trafficking cocaine and heroin to detectives: first, that the person was a "light skinned black man, heavyset" "with a full beard"; and second, the vehicle tags for the person's car. J.A. 64. Although informant assisted detectives in other cases, she failed to provide any specific identifying information about Appellant: she did not provide a name, an address, or any information predicting his movements, such as a particular place or time he was expected to be in possession of or sell drugs. In fact, the only information that proved useful to detectives in connecting the informant's tips to Appellant was the vehicle

14

tag number that was connected to him. But that alone does not connect him to drug trafficking. It connects him to a vehicle and that is it. Of note, despite the informant's ability to communicate with Appellant, detectives never attempted to confirm the informant's allegation by setting up a controlled buy between the informant and Appellant nor did they seek any predictive information that would lend to her credibility. Thus, the information provided by the informant as to Appellant's alleged illegal activities deserves little weight in the totality of the circumstances.

2.

In addition to the tip from the informant, the Government relies heavily on the second handshake that occurred between Appellant and one of the men he met at the Car Stereo Warehouse. But, before we address the second handshake, we pause to highlight the fact that although Appellant purportedly received a re-supply of drugs on either Feb. 2, 3, or 4, it was not until nearly a week later, on February 9 that law enforcement determined to stop Appellant. And, at no point did the officers attempt to set up a controlled purchase with the informant whom they directed to ask Appellant about his drug supply.

As to the notorious second handshake, the Government contends this second handshake provided the officers with reasonable suspicion because Detective Murphy testified that the second handshake was a "hand-to-hand" transaction. However, Detective Murphy never provided more than this conclusory testimony. In fact, Detective Murphy never witnessed drugs or money change hands, and his testimony did not provide any details about the handshake that allows us to view this second handshake as suspicious. *See United States v. Foster*, 634 F.3d 243, 247–48 (4th Cir. 2011) (finding that officers did

15

not have reasonable suspicion in part because officers never saw the defendant "in the possession of any drugs, money, weapons or paraphernalia"). The Government encourages us to look at this handshake within the totality of the circumstances. Even doing so, we cannot hold that officers' bare suspicion of drug trafficking -- without more -- can allow even an experienced officer to reasonably conclude that such a benign and common gesture can be viewed as an exchange of drugs. This cannot amount to reasonable, particularized suspicion. The Fourth Amendment does not allow the Government to label a person as a drug dealer and then view all of their actions through that lens.

3.

Further, when considered within the panoply of the totality of the circumstances in this case, both the informant's information and the second handshake become even less convincing. While the Government attempts to rely on officers' suspicions about Appellant's activities allegedly involving narcotics, the officers' surveillance provided them with nothing more than a single suspected drug exchange in which officers found no drugs, even after searching the white pickup truck that was suspected to be involved,[3] and another incident in which Appellant simply drove to a gas station, parked, and left. We cannot see how these events elevate the officers' hunch that Appellant was engaged in drug trafficking to reasonable suspicion. Additionally, despite surveilling Appellant over the course of several months -- ten times at the address associated with him and more than 30

---

[3] Not to mention that it is implausible to think that, while driving down the highway alone, the driver of the white pickup truck cooked the drugs in the manner detectives described.

times at the female's address -- officers never observed suspicious behavior or drug transactions at those locations. Not once.

Moreover, on the day of the Car Stereo Warehouse stop itself, several notable facts dispel the notion that Appellant was engaged in a drug transaction. First, although Detective Moore testified that the interaction between Appellant and the two men at the Car Stereo Warehouse was consistent with "how drugs are sold or bought in Charlotte," the occurrence at the Car Stereo Warehouse parking lot did not at all meet Detective Moore's description of how drugs are sold or bought. J.A. 71. Detective Moore testified that he would expect one person to exit the vehicle, enter the other vehicle, exchange drugs, leave their vehicle, and then leave the transaction. But, here, the alleged drug transaction occurred outside of the vehicles. Also, instead of any of the men re-entering their own vehicles and leaving the location, all three men entered the store together and proceeded to conduct a normal shopping trip.[4]

Finally, the entire interaction occurred in broad daylight, in the middle of the afternoon, in a public parking lot, and in front of a security camera. Taken together with the uncorroborated informant information and the inconclusive surveillance detectives had conducted in which no drugs were ever located, Appellant's presence at the Car Stereo Warehouse failed to create reasonable suspicion sufficient to justify a *Terry* stop.

---

[4] Detective Moore's attempt to spin the fact that one of the men with Appellant attempted to pull the bag closer to him in the store when Detective Moore passed nearby as somehow nefarious does not garner much credence. It is not out of the norm for people to reflexively pull their bags closer to them when someone passes close by, even bags that do not contain drugs.

17

Given all of the foregoing, "we are skeptical of Government attempts to spin . . . largely mundane acts into a web of deception." *Foster*, 824 F.3d at 89 (internal quotation marks omitted). Consequently, we reverse the district court's denial of the motion to suppress.

## C.

Because we hold that officers did not have reasonable suspicion to conduct an investigatory stop of Appellant, the subsequent frisk of Appellant likewise cannot be justified. Therefore, we need not reach the question of whether officers manipulated Appellant's pocket during the pat down. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968).

## IV.

For the foregoing reasons, the district court's denial of Appellant's motion to suppress is reversed and this case is remanded to the district court.

*REVERSED AND REMANDED*

WYNN, Circuit Judge, concurring:

Detective Moore investigated Drakeford for months. He observed him dozens of times. One rendezvous between Drakeford and a supposed customer at a gas station led to the discovery of syringes, but no drugs. On a second occasion, Drakeford appeared to wait for someone, but no one ever arrived. So the investigation continued.

Moore eventually had his informant call Drakeford and ask whether he had drugs to sell. The informant reported that he didn't. But later that day, Moore watched as Drakeford entered an unfamiliar residence emptyhanded. A woman arrived with several bags. About half an hour later, Drakeford left carrying a bag. And shortly thereafter, the informant called Moore to say that Drakeford "now had drugs to sell." J.A. 75–77.

The stage was set, so to speak. Days later, Moore and his surveillance team followed Drakeford to Car Stereo Warehouse. Patrol officers were on standby. Law enforcement "expect[ed] someone to meet . . . Drakeford." J.A. 78. Moore "honestly believed that . . . a drug deal was going to happen." J.A. 79.

But no one saw any money. No one saw any drugs. The closest thing to a "deal" was a pair of handshakes—witnessed by Detective Murphy from some distance away, and the second of which was heartier than the first.

Was that second handshake just a handshake? Or was it something more? The district court credited Murphy's testimony that the handshake was, in fact, a "hand-to-hand" transaction. Why? Because Murphy had been a narcotics officer for "[a]bout four years." J.A. 117. In that capacity, he'd seen "[s]everal dozen" hand-to-hand transactions and, acting undercover, even conducted a few himself. J.A. 117–18. Drakeford's

19

interaction was apparently "consistent with" the hand-to-hands he'd seen and done. J.A. 118.

But it was also consistent with two friends shaking hands. So, what was it about this handshake, specifically, that led Murphy to see it as something more nefarious? The record testimony is far from enlightening. According to Murphy, the second handshake was "more deliberate" than the first and "wasn't as brief." *Id.* That's it.

We therefore have thin facts—the handshake appeared long and purposeful—bolstered by a thinner interpretation of those facts—the handshake was "consistent with" a drug transaction. Such meager testimony would not have received the same degree of deference had it come from someone other than a law-enforcement officer. But in the half-century since *Terry v. Ohio*,[*] we have afforded greater and greater weight to officers' "training and experience"—often at the expense of the robust judicial scrutiny that the Fourth Amendment demands. *See* Anna Lvovsky, *The Judicial Presumption of Police Expertise*, 130 Harv. L. Rev. 1995, 2031–37, 2079–80 (2017) ("[T]he cumulative effects of judges' many encounters with the police [have] combined to give courts an unusual regard for the reliability of the police's professional insight.").

No doubt, experienced officers can see things the rest of us would miss. *See, e.g.*, *Ornelas v. United States*, 517 U.S. 690, 700 (1996) (explaining that a "loose panel" in a car "may suggest only wear and tear" to a layperson but could reasonably indicate the

---

[*] "[D]ue weight must be given . . . to the specific reasonable inferences which [an officer] is entitled to draw from the facts in light of his experience." 392 U.S. 1, 27 (1968).

presence of hidden drugs to an officer). But the success or failure of a suppression motion cannot hinge on an officer saying, in essence, "I know it when I see it." It is not a heavy burden for officers to "articulate *why* a particular behavior is suspicious." *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011) (emphasis added); *see also Brown v. Texas*, 443 U.S. 47, 52 n.2 (1979) (officer may "perceive *and articulate* meaning" in otherwise innocent conduct (emphasis added)). And it is not a heavy burden for courts to demand such an explanation from officers who, as in this case, testify as to *both* the underlying, objective facts *as well as* the significance of those facts.

Our practice of affording strong deference to "training and experience" has costs. For starters, it incentivizes veteran officers to lean on their "impressions" instead of doing the hard work of building a case, fact by fact. That's a worrisome consequence, given what we now understand (and are still coming to understand) about bias. "[An] increasingly vast psychological literature" shows that "a substantial portion of the racial profiling that occurs in modern policing is the product not of explicit racism but of implicit [bias]." Megan Quattlebaum, *Let's Get Real: Behavioral Realism, Implicit Bias, and the Reasonable Police Officer*, 14 Stan. J. C.R. & C.L. 1, 13 (2018); *see id.* at 10–17 (summarizing the literature on this point). And "[o]ne behavioral effect of implicit bias is that it influences how individuals interpret the ambiguous behaviors of others." L. Song Richardson, *Police Efficiency and the Fourth Amendment*, 87 Ind. L.J. 1143, 1148 (2012). Thus, there are "good cognitive reasons to avoid . . . bare reliance on generalizations based on officer 'experience'" when evaluating ambiguous behavior like a handshake. Andrew E. Taslitz,

*Police Are People Too: Cognitive Obstacles to, and Opportunities for, Police Getting the Individualized Suspicion Judgment Right*, 8 Ohio St. J. Crim. L. 7, 31 (2010).

But also, the more we defer to "experience" as a placeholder for objective facts, the more variability we inject into the Fourth Amendment. It is not hard to imagine a scenario in which an investigatory stop "made by a knowledgeable, veteran officer would be [considered] valid" while the same stop "made by a rookie *in precisely the same circumstances* would not." *Devenpeck v. Alford*, 543 U.S. 146, 154 (2004) (emphasis in original). But, as the Supreme Court has cautioned, we should avoid "ascrib[ing] to the Fourth Amendment such arbitrarily variable protection." *Id.*

In my view, judges can begin to curb these ill effects by dialing down the deference—even slightly—and treating police officers like other expert witnesses. Doing so would be consistent with both precedent and common sense. If a veteran officer catches something that would elude a novice—a code word, a pattern, etc.—he may of course rely on it, so long as he can later explain in court why the fact is significant. But if an officer's explanation is paltry or conclusory, as in this case, the judge must not hesitate to assign it less weight.