RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0088p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

No. 19-5633

JERMAINE TYRONE JONES,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Western District of Kentucky at Paducah.
No. 5:17-cr-00039-1—Thomas B. Russell, District Judge.

Argued:  March 12, 2020

Decided and Filed:  March 23, 2020

Before:  SUTTON, McKEAGUE, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Amanda B. Harris, UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Appellant.  Frank W. Heft, Jr., FEDERAL PUBLIC DEFENDER, Louisville,
Kentucky, for Appellee.  **ON BRIEF:**  Amanda B. Harris, UNITED STATES DEPARTMENT
OF JUSTICE, Washington, D.C., for Appellant.  Frank W. Heft, Jr., Scott T. Wendelsdorf,
FEDERAL PUBLIC DEFENDER, Louisville, Kentucky, for Appellee.

_____

## OPINION

_____

SUTTON, Circuit Judge.  Officers stopped Jermaine Jones' vehicle to investigate
allegations that he committed fourth-degree assault, a misdemeanor in Kentucky.  During the
stop, they discovered a weapon on Jones, a convicted felon.  Indicted for unlawful possession of

a firearm, Jones moved to suppress the evidence recovered from the stop on the theory that the Fourth Amendment bars investigatory stops prompted by a completed misdemeanor. The district court reluctantly agreed. Because the Fourth Amendment contains no such rule, we reverse.

I.

On April 30, 2017, Ti'Erica McKinney called the Paducah police department to report a domestic violence incident. Several officers, including Andrew Parrish, arrived at the scene. McKinney told Parrish that she had come home from work to find her ex-boyfriend, Jermaine Jones, inside her house. She asked Jones to leave. When he refused, they began arguing. Matters got out of hand. Jones poured dish detergent over her couch, then chased her out of the home. Once outside, Jones threw Sprite cans and a bottle of dish soap at McKinney as she ran for help. McKinney dodged the cans but did not evade the bottle of dish soap. McKinney eventually returned to see William Snipes, Jones' friend, driving Jones away in a white "Tahoe-like vehicle with a long body." R.37 at 2.

Officer Parrish took steps to corroborate McKinney's story. He questioned her about reports that other people had come to her aid. McKinney admitted that her brothers had arrived before the police but left when Jones fled to avoid dealing with the authorities. Around the house, Officer Parrish saw items consistent with McKinney's account. He found a soap-stained couch and a bottle of detergent on the floor. He also spotted Sprite cans near McKinney's vehicle and noticed damage to the car. In her front yard, he located the bottle of dish soap that had hit McKinney's back. When McKinney showed Officer Parrish her injury, he pointed out that he could not see any bruising but acknowledged it might take a few days for the harm to show.

Consistent with department policy, Officer Parrish and McKinney filled out a "Domestic Violence Lethality Screen," a questionnaire to determine if an officer should refer a victim to domestic violence resources. She told Officer Parrish that Jones had threatened to kill her in the past, might try to kill her in the future, and could easily obtain a gun. McKinney elaborated that Jones had strangled her and kicked in her front door. She repeatedly told Parrish, without

prompting, that she planned to get an emergency protective order against Jones and that she feared he would return to attack her once the officers left.

To allay McKinney's concerns, Officer Parrish stayed in his car next to the house and finished up some paperwork. The caution paid off. Shortly after Officer Parrish finished up with McKinney, he saw two black males in a white Chevy Suburban sitting at the intersection near McKinney's home. Parrish pulled the Suburban over and approached the passenger side, where Jones sat. After a brief discussion, Parrish asked Jones to exit the vehicle and escorted him to Parrish's car. A quick pat-down of Jones revealed nothing. Asked about the incident, Jones denied everything: the detergent, the Sprite cans, the dish soap. Parrish did not believe him and arrested him for the assault. He cuffed Jones, conducted a second, more thorough, search, and placed him in the back of his squad car.

Jones began yelling that Parrish had cuffed him too tightly. When Parrish checked the cuffs, he spotted a firearm in the back of his cruiser that he had not seen before. That led to a charge of unlawful possession of a firearm.

Jones moved to suppress the gun. Officer Parrish violated the Fourth Amendment, Jones claimed, because he stopped the vehicle on the suspicion Jones had committed a crime. To make a valid stop, Jones asserted, Parrish needed a reasonable suspicion of ongoing or imminent criminal activity. At the hearing, Parrish confirmed that he had stopped Jones' vehicle solely to "further investigate" McKinney's allegations of assault. R.30 at 7. In Kentucky, her accusation amounted to fourth-degree assault, a misdemeanor. Ky. Rev. Stat. Ann. § 508.030(1)(a).

Relying on dicta from two of our decisions, the court "reluctantly" suppressed the evidence. R.37 at 6–7. The government appealed.

II.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. When an officer stops a vehicle and questions the occupants, even for a brief moment, that counts as a "seizure" of "persons." *Whren v. United States*, 517 U.S. 806, 809 (1996). Officers

may conduct these stops if, among other justifications, "specific and articulable facts," *Terry v. Ohio*, 392 U.S. 1, 21 (1968), support a reasonable suspicion that the car's "occupants are involved in criminal activity," *United States v. Hensley*, 469 U.S. 221, 226 (1985). But what happens if the officer stops a vehicle to investigate criminal activity that already occurred? We know the answer in part. If the activity qualifies as a felony, the Fourth Amendment does not bar the stop. *Id.* at 229.

What about non-felony crimes? Does the Fourth Amendment prohibit officers from making a *Terry* stop to investigate a misdemeanor? Attentive readers of Fourth Amendment caselaw should be skeptical of such a standard. "[T]he touchstone of the Fourth Amendment is reasonableness," not "bright-line rules." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). And the Supreme Court has consistently rejected lower courts' attempts to avoid dealing with "endless variations in the facts and circumstances implicating the Fourth Amendment" by crafting "litmus-paper" tests or "single sentence or paragraph" rules. *Id.* (quotation omitted); *see also Hensley*, 469 U.S. at 226–27.

The Court has given us some of the tools to answer the question already. *Hensley* explained that the "proper way" to identify the "precise limits on investigatory stops to investigate past criminal activity" is to "apply the same test already used to identify the proper bounds of intrusions that further investigations of imminent or ongoing crimes." *Hensley*, 469 U.S. at 228. Courts must balance "the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *Id.*

True, *Hensley* left open whether "*Terry* stops to investigate all past crimes, however serious, are permitted." *Id.* at 229. But it did not erect an "automatic barrier" to investigating completed misdemeanors either. *Id.* The Court left it to the lower courts to apply the traditional Fourth Amendment considerations, rather than create an "inflexible rule" if and when the question of investigating a completed misdemeanor (or other non-felony crime) came up. *Id.* at 227.

The Court's guidance has prompted every other circuit to follow the *Hensley* facts-and-circumstances test in considering the misdemeanor side of the problem. *United States v. Hughes*,

517 F.3d 1013, 1017–18 (8th Cir. 2008); *United States v. Grigg*, 498 F.3d 1070, 1076–77, 1081 (9th Cir. 2007); *United States v. Moran*, 503 F.3d 1135, 1141–43 (10th Cir. 2007). In doing so, the circuit cases sometimes come out on the side of the government, *Moran*, 503 F.3d at 1143, sometimes on the side of the defendant, *Grigg*, 498 F.3d at 1081–83; *Hughes*, 517 F.3d at 1018–19.

An across-the-board prohibition on stops to investigate completed non-felonies runs into other problems, including the elusive and evolving nature of the felony-misdemeanor distinction and its disappearance in some instances. While "in earlier times the gulf between the felonies and the minor offences was broad and deep, . . . today the distinction is minor and often arbitrary." *Tennessee v. Garner*, 471 U.S. 1, 14 (1985) (quoting 2 F. Pollock & F. Maitland, *The History of English Law* 467 n.3 (2d ed. 1909)). Once upon a time, "felony" described the most severe crimes. "No crime was considered a felony which did not occasion a total forfeiture of the offender's lands or goods or both." *Kurtz v. Moffitt*, 115 U.S. 487, 499 (1885); *see also Garner*, 471 U.S. at 13 n.11. Today, serious crimes are usually felonies, but not always. In Kentucky, where Jones' arrest occurred, it is a *misdemeanor* to incite a riot, possess burglar's tools, stalk someone, or flee the police. Ky. Rev. Stat. Ann. §§ 508.150, 511.050, 520.100, 525.040. And the Commonwealth treats stealing mail, driving a car without permission (for the second time), and receiving deposits at an insolvent financial institution as felonies. *Id.* §§ 514.100, 514.140, 517.100. Some States leave the classification to prosecutors and judges. *See Ewing v. California*, 538 U.S. 11, 17 (2003). The status of these "wobbler" crimes thus may not be known until the crime is charged or the offender sentenced. *Id.* If our touchstone is reasonableness, it's odd to say that police could stop a suspect on reports he had stolen mail but not on reports he had incited a riot (or assaulted someone)—or that a valid stop to investigate a felony becomes invalid if the prosecutor charges it as a misdemeanor. All of this confirms the danger of using misdemeanor labels alone to define the coverage of the Fourth Amendment.

Treating the offense's misdemeanor label as an idée fixe and ignoring the interests at stake also would not work for the States that have eliminated these distinctions. Take Maine, which divides crimes into five classes. Me. Rev. Stat. Ann. tit. 17-A § 4. The only way to decide how the Fourth Amendment applies to stops investigating a "Class A" or a "Class B"

crime is to fall back on other principles—the risks to the community of the crime. And though most States continue to use words like "felony" and "misdemeanor," many have added new variants. Minnesota and Washington criminalize "misdemeanor[s]" and "gross misdemeanor[s]." Minn. Stat. § 609.02; Wash. Rev. Code Ann. § 9A.04.040. And Pennsylvania separates out murders from felonies and misdemeanors. 18 Pa. Stat. & Cons. Stat. Ann. § 106(a)(1). A per se rule against investigating a certain class of crime offers no help in deciding whether seizures related to these bottomless variations are reasonable.

The better rule in this setting is not bright in either direction. It does not say that officers always may make a *Terry* stop of an individual known to have completed a misdemeanor, as *Hensley* permits for completed felonies. And it does not say that officers never may make a *Terry* stop of an individual known to have completed a misdemeanor. It instead falls back on reasonableness, balancing the interests in public safety and personal liberty. The inquiry turns not on whether the suspect already completed a crime. It turns on the nature of the crime, how long ago the suspect committed it, and the ongoing risk of the individual to the public safety. Under this approach, the Fourth Amendment correctly appreciates the distinction between officers who illegitimately invoke *Terry* to stop someone who ran a red light sixth months ago and legitimately use it to stop someone who assaulted a spouse in the past half hour.

These dynamics are captured in two questions. Did an officer stop a suspect to investigate a completed felony? If yes, we move on to consider the reasonableness of the officer's suspicion. If the offense goes by another name, we ask whether *this* stop for *this* offense violates the Fourth Amendment. *See Hughes*, 517 F.3d at 1017; *Grigg* 498 F.3d at 1081; *Moran*, 503 F.3d at 1142. *Hensley* tells us to consider several factors in balancing the security and liberty interests. Does the stop "promote the interest of crime prevention"? *Hensley*, 469 U.S. at 228. Does it further "[p]ublic safety"? *Id.* How strong is the government's interest in "solving crimes and bringing offenders to justice" in this case? *Id.* at 229. And would "[r]estraining police action until after probable cause is obtained" unnecessarily hinder the investigation or allow a suspect to "flee in the interim"? *Id.*

Gauged by these considerations, this stop passes. At the time he pulled Jones over, Parrish had a reasonable suspicion that Jones had assaulted McKinney. He had corroborated

almost every part of her account, and the car he saw matched her description. Stopping the vehicle directly promoted the interest of preventing crime. McKinney credibly alleged that Jones intended to harm her or her home.

The stop also promoted public safety. McKinney told the officer that Jones could get a firearm easily, attacked her before, and recently fought with her brothers. Hailing down the vehicle gave Parrish the chance to stop Jones from further violence and threats. By stopping Jones' car to investigate McKinney's allegations of assault, misdemeanor or not, felony or not, Parrish used common sense and acted in eminently reasonable fashion.

Jones resists this conclusion on two grounds.

He points us to three cases that say an officer may not conduct a *Terry* stop to investigate a completed misdemeanor. *Gaddis v. Redford Township*, 364 F.3d 763, 771 n.6 (6th Cir. 2004); *United States v. Roberts*, 986 F.2d 1026, 1030 (6th Cir. 1993); *United States v. Halliburton*, 966 F.2d 1454, 1992 WL 138433, at *4 (6th Cir. 1992) (table). But *Halliburton* is an unpublished decision, which does not bind later panels. *United States v. Sanford*, 476 F.3d 391, 396 (6th Cir. 2007). And the cited language in *Roberts* and *Gaddis* is dicta, unnecessary to either outcome. Later decisions of ours confirm the point. *United States v. Collazo*, 818 F.3d 247, 253–54 (6th Cir. 2016); *United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008).

Tacking in a different direction, Jones says we should adopt a per se rule because it accords with Kentucky law. True, Kentucky affords greater protections for its citizens when officers investigate past crimes. *See* Ky. Rev. Stat. Ann. § 431.005(1). But its prerogative to experiment with greater constitutional protections does not require the Fourth Amendment to do the same. *Virginia v. Moore*, 553 U.S. 164, 171 (2008); *see Kansas v. Carr*, 136 S. Ct. 633, 641 (2016).

That leaves Jones' alternative argument—that we should affirm the district court because Officer Parrish lacked probable cause to arrest him for assaulting McKinney. But probable cause "is not a high bar." *District of Columbia v. Wesby*, 138 S.Ct. 577, 586 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). And Parrish cleared it. McKinney told Parrish that Jones assaulted her. "Unless, at the time of the arrest, there is an apparent reason for [an] officer

to believe [an] eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation," that accusation is sufficient to establish probable cause. *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (quoting *United States v. Amerson*, No. 93-6360, 1994 WL 589626, at *3 (6th Cir. Oct. 21, 1994). In this instance, Parrish had more than just McKinney's accusation. He had all of the evidence around him corroborating her story. On top of that, the white Suburban pulled up to the intersection at McKinney's home, just as she had predicted. Once Officer Parrish identified Jones as the passenger, if not before then, his reasonable suspicion "developed into probable cause" to make the arrest. *United States v. Harflinger*, 436 F.2d 928, 934 (8th Cir. 1970); *see Hoover v. Walsh*, 682 F.3d 481, 500 n.53 (6th Cir. 2012).

Jones counters that Officer Parrish lacked probable cause because "it was not shown" that McKinney had sustained a "physical injury"—an essential element of fourth-degree assault. Appellee Br. 31. Jones is getting ahead of himself. Prosecutors, not arresting officers, must prove elements of the offense. *See Thacker v. City of Columbus*, 328 F.3d 244, 256 (6th Cir. 2003). Parrish knew enough facts to conclude Jones had probably assaulted McKinney. She described the pain she experienced and showed him plenty of evidence that confirmed the incident. Although he did not see any bruising on her back, he reasonably inferred that it might take time for bruises to show given how recently the attack occurred. Perhaps at trial, Jones could show that McKinney had not suffered "physical injury" significant enough to satisfy Kentucky's requirements. But at the point of arrest, the facts showed that Jones probably engaged in criminal activity. *Wesby*, 138 S. Ct. at 586.

We reverse.