**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 22-4564**

───────────────

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

ANTHONY CORNELIUS BROWN, JR.,

Defendant – Appellant.

───────────────

**No. 22-4565**

───────────────

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

DEQUANE AQUIL MCCULLERS,

Defendant – Appellant.

───────────────

Appeals from the United States District Court for the Eastern District of Virginia at Richmond. John A. Gibney, Senior District Judge. (3:21-cr-00131-JAG-2; 3:21-cr-00131-JAG-1)

───────────────

Argued: December 8, 2023                                    Decided: August 16, 2024

Before WILKINSON, WYNN, and RICHARDSON, Circuit Judges

Affirmed by published opinion. Judge Richardson wrote the opinion, in which Judge Wilkinson joined. Judge Wynn wrote a dissenting opinion.

**ARGUED:** Amy Leigh Austin, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia; Gregory Robert Sheldon, BAIN SHELDON, PLC, Richmond, Virginia, for Appellants. Stephen Eugene Anthony, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee. **ON BRIEF:** Geremy C. Kamens, Federal Public Defender, Carolyn V. Grady, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLICE DEFENDER, Richmond, Virginia, for Appellants. Jessica D. Aber, United States Attorney, Richmond, Virginia, Daniel J. Honold, Assistant United States Attorney OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

RICHARDSON, Circuit Judge:

Anthony Cornelius Brown, Jr., and Dequane Aquil McCullers appeal after the district court denied their motions to suppress evidence of firearms found during an investigatory stop. Because the officers acted reasonably in detaining and frisking Brown and McCullers, we affirm.

## I.    BACKGROUND

Around 5:00 a.m. on July 23, 2021, Detective Frias of the Richmond Police Department observed an Instagram video posted about an hour or two earlier by J.S., a known gang member.[1] The video depicted J.S. and six others making hand gestures and wildly waving various firearms, from small handguns to high-capacity rifles, in front of the 4024 building of the Belt Atlantic apartment complex. Despite being in the middle of a residential area, the subjects of the video could be seen pointing the weapons in the air, in random directions, and directly at the camera.

---

[1] As we are reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government. *United States v. Rush*, 808 F.3d 1007, 1010 (4th Cir. 2015).



Gov't Exh. 1 (Instagram Video) (left-to-right, 00:12, 00:07, 00:18)

Two men drew Detective Frias's attention. The first, who was later identified as McCullers, wore a black hat with a white Chicago Bulls emblem and exposed underwear featuring a distinctive red-and-yellow pattern. The second, who was later identified as Brown, wore a hooded purple jacket and had long dreadlocks. After viewing the video, Detective Frias and his colleagues accessed live video surveillance of the apartment complex. The footage showed a person wearing a hooded purple jacket—just like the one Brown was wearing in the Instagram video—and another person carrying a drum magazine—a cylindrical, high-capacity magazine—standing outside the 4024 building. So Detective Frias, along with Sergeant Rogers and Detectives Spence, Story, and Farnsworth, travelled to the complex. En route, Detective Spence continued to monitor the surveillance

4

footage, this time spotting someone wearing the same distinctive underwear and Chicago Bulls hat McCullers wore in the Instagram video.

When the officers arrived ten-to-fifteen minutes later, Brown and McCullers, along with two others, were still standing outside the 4024 building. Detectives Frias and Story approached the men, but they walked away and eventually started climbing the outdoor stairwell of the neighboring 4026 building. Though Detective Frias told the men to stop, they ignored his orders. Then, as Brown reached the first-floor landing, he moved his hands to the front of his torso while facing away from Detective Frias. This led Detective Frias to point his weapon at Brown and tell him to "stop reaching." Brown complied, and Detective Frias handcuffed him. Detective Frias then began to pat Brown down, but, after Brown said he wore a colostomy bag, the detective declined to perform a thorough frisk.

At about the same time, Sergeant Rogers, who had approached the complex from the other direction, followed McCullers up to the third-floor landing. There, Sergeant Rogers ordered McCullers to show his hands and get on the ground, and McCullers complied. Sergeant Rogers then handcuffed McCullers and frisked him, discovering a firearm tucked inside his underwear.[2]

Having secured both Brown and McCullers, the two officers next asked them both for identifying information. Brown gave his name, date of birth, and social security number, while McCullers produced a state-issued identification. Sergeant Rogers also

---

[2] At this same time, the remaining detectives were stopping the two other men they had seen outside the 4024 building, recovering guns from each.

asked McCullers whether he had ever been convicted of a felony. McCullers responded by admitting he had been.

Meanwhile, Detective Frias texted Brown's information to Detective Story, who was in charge of running all the information—both personal information and information about the guns recovered from McCullers and the two others—that the detectives collected. It then took Detective Story nine minutes to retrieve his patrol car and, after running information for twenty-nine minutes, he informed Detective Spence that she could let Brown go. Before doing so, however, Detectives Spence and Frias spent a few minutes checking the area for discarded weapons. Discovering none, the detectives prepared to release Brown after forty-six minutes of detaining him. But only then did they notice a bulge in Brown's pants, which turned out to be a gun. Detective Story then ran one more background check to determine whether Brown had any prior felonies. He discovered that Brown did, so the detectives arrested him.

Brown and McCullers were charged with possessing firearms as felons in violation of 18 U.S.C. § 922(g)(1). Both moved to suppress evidence of the guns found on their persons. After an evidentiary hearing, the district court denied the motions. Brown and McCullers subsequently entered into conditional guilty pleas, reserving the right to challenge on appeal the district court's denial of their suppression motions. Following sentencing, they timely appealed.

## II.    DISCUSSION

The Fourth Amendment protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Under *Terry v. Ohio*, 392

6

U.S. 1 (1968), law enforcement officers may reasonably detain a person temporarily for investigative purposes when they have an objectively reasonable and particularized suspicion that the person has committed or is committing a crime. *United States v. Black*, 525 F.3d 359, 364 (4th Cir. 2008). Additionally, once that person has been lawfully detained, officers may frisk him if they "reasonably suspect that the person is armed and therefore dangerous." *United States v. Robinson*, 846 F.3d 694, 700 (4th Cir. 2017) (en banc).

In this case, the defendants argue that the detectives lacked reasonable articulable suspicion to stop them, lacked reasonable suspicion to believe that McCullers was armed, and impermissibly extended the length of Brown's stop. We disagree.[3]

**A.      The officers had reasonable suspicion to stop the defendants.**

To start, the Instagram video that showed Brown, McCullers, and others waving firearms and pointing them directly at the camera provided the officers with reasonable suspicion to stop the two men. That's because, under Virginia law, it is "unlawful for any person to point, hold or brandish any firearm . . . in such manner as to reasonably induce fear in the mind of another." Va. Code. § 18.2-282(A).[4] Here, the district court found that

---

[3] "When reviewing a ruling on a suppression motion, we review the district court's legal determinations de novo and factual findings for clear error." *United States v. Rush*, 808 F.3d 1007, 1010 (4th Cir. 2015).

[4] Understanding our good friend's zeal for the Second Amendment, we do not address the constitutionality of the statute because Appellants have not raised it. *See United States v. Rahimi*, 144 S. Ct. 1889, 1903 n.2 (2024). But it's fair to say that such a claim would face a steep climb. *See id.* at 1899 ("From the earliest days of the common law, (Continued)

the Belt Atlantic apartment complex is a hot spot for gang violence where gang members

"post inciting videos on social media to goad each other to violence." *United States v.*

*McCullers*, 591 F. Supp. 3d 38, 47 (E.D. Va. 2022); *see also id.* at 42 n.3 ("It has been the

experience of the detectives and officers who patrol the Apartments that one of the causes

of violence at the Apartments is gang activity, sometimes prompted by disagreements cast

on social media."). Thus, a reasonable officer could suspect that a video posted by a known

gang member—J.S.—featuring hand gestures and aggressive posturing with firearms was

meant to communicate a message to members of other gangs in the area.[5] What's more, in

an area where gang violence has a history of turning deadly,[6] a reasonable officer could

firearm regulations have included provisions barring people from misusing weapons to harm or menace others.").

Raising another argument not made by defendants here, the dissent suggests that the *Terry* stop cannot be supported by the completed misdemeanor . Dissenting Op. at 25–26 (citing a multifactor test from *United States v. Jones*, 953 F.3d 433, 436–37 (6th Cir. 2020)). Without resolving this unpreserved argument, we simply note that no party objected to the district court's conclusion that each of the factors from *Jones* supported the detectives' stop. *McCullers*, 591 F. Supp. 3d at 47 n.14 ("[E]ach of these [*Jones*] factors weigh in the detectives' favor; they reasonably suspected that earlier that morning, in a residential area with a propensity for violence, the defendants had waved about multiple guns, including high-capacity rifle-style guns, possibly to provoke opposing gangs.").

[5] The dissent also objects that the video did not include "direct, verbal communications." Dissenting Op. at 21. But, "[o]f course, threats can be communicated verbally or nonverbally—pointing a gun at a cashier conveys a threat no less effectively than passing a note reading 'your money or your life.'" *United States v. Taylor*, 596 U.S. 845, 855 (2022); *see also United States v. Gordon*, 69 F.4th 932, 933 (8th Cir. 2023) ("[A]n implicit threat is still a form of communication, and *Taylor* recognized that threats can be communicated verbally or nonverbally.").

[6] The district court found that only "a few months before the incident at issue here, a shooting occurred in the Apartments which left a mother and her three-month-old baby dead." *McCullers*, 591 F. Supp. 3d at 42 n.3.

8

suspect that the message would cause the recipient or rival gang members to reasonably "be apprehensive of bodily harm." *Dezfuli v. Commonwealth*, 707 S.E.2d 1, 5 (Va. Ct. App. 2011) (quoting *Huffman v. Commonwealth*, 658 S.E.2d 713, 714 (Va. Ct. App. 2008)).

Furthermore, we agree with the district court that, though the video was undated, the officers had reason to believe that it was taken only an hour or two before they saw it. The timestamp on the video shows that it was posted somewhere between an hour and two hours before the officers arrived at the Belt Atlantic apartment complex. And when the officers looked at the live video surveillance, both defendants were in the same location wearing the same outfits as they had in the Instagram video. Based on this evidence, an officer could reasonably suspect that the video was taken shortly before—if not at the same time as—it was posted. Considering the public interest in addressing what an officer could reasonably suspect was gang-related brandishing in a densely populated residential area, it was not unreasonable for the officers to investigate.[7] *Cf. United States v. Hensley*, 469 U.S. 221, 229 (1985).

---

[7] The dissent relies on *United States v. Black*, 707 F.3d 531 (4th Cir. 2013), to argue that the display of a weapon cannot support an investigatory stop. Dissenting Op. at 19–20. But this overreads the case. As we have explained: "*Black* explicitly allows that the possession of a firearm [in an open carry state], though lawful, can contribute to reasonable suspicion in the totality of the circumstances." *Walker v. Donahoe*, 3 F.4th 676, 683 (4th Cir. 2021); *see also United States v. Foster*, 824 F.3d 84, 94 (4th Cir. 2016). So the presence of a firearm alongside "something 'more'" can create reasonable suspicion. *Walker*, 3 F.4th at 683 (quoting *Black,* 707 F.3d at 540). Here, there was more. The officers' reasonable suspicion was based not on the lawful open carry of a firearm but rather on the brandishing firearms in the context we've discussed.

Even if the two videos themselves did not provide reasonable suspicion, they surely do when combined with how the defendants acted after officers arrived but before officers seized them. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) (noting that seizures generally require the application of physical force or submission to a show of authority). Recall that both men immediately started to leave the area and ignore the officers' commands once the officers approached them. Such "'[e]vasive conduct, although stopping short of headlong flight,' is still an important factor for a court to consider when making a reasonable suspicion determination." *United States v. Bumpers*, 705 F.3d 168, 175 (4th Cir. 2013) (alteration in original) (quoting *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993)).

We thus conclude that the detectives had reasonable suspicion to stop both Brown and McCullers.

### B.    The officers had reasonable suspicion to frisk the defendants.

Next, Sergeant Rogers's frisk of McCullers was constitutional.[8]  Remember, the Constitution permits officers to frisk lawfully stopped suspects so long as the officer reasonably believes that the person is armed. *Robinson*, 846 F.3d at 700.  We conclude, like the district court, that Sergeant Rogers reasonably believed that McCullers was armed. As we have noted, the detectives could have reasonably believed that the Instagram video was taken only an hour or two before they interacted with the defendants.  And in that video, McCullers was armed.  A reasonable officer could have suspected that McCullers

---

[8] Brown does not challenge being initially frisked.

continued to bear the same firearm he brandished just a few hours earlier. *See id.* at 696, 698 (noting an officer could reasonably have believed Robinson was armed after he had acted suspiciously and an eyewitness had seen him with a weapon just a short time before). Additionally, based on the Instagram video and the video surveillance, the detectives reasonably suspected that McCullers had just participated in a gang-related brandishing incident. When an officer reasonably suspects that a person has recently engaged in, is engaging in, or is about to engage in conduct that would "likely involve the use of weapons," that officer may reasonably assume the person is armed absent some indication to the contrary. *Terry*, 392 U.S. at 28.

Thus, Sergeant Rogers reasonably suspected that McCullers was armed, so the district court was right to deny the latter's motion to suppress.

### C.     The officers did not impermissibly extend Brown's stop.

Finally, the scope and length of Brown's stop was reasonable under the circumstances. Under *Terry*, an investigative detention can last no longer than reasonably necessary to carry out the "mission" of the stop. *See United States v. Perry*, 92 F.4th 500, 510 (4th Cir. 2024). While a stop's primary mission is "to verify or dispel [an] officer's suspicion," *id.* (quoting *United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007)), that is not all. The mission also "includes 'ordinary inquiries incident to [a] stop,'" such as "checking [identification], determining whether there are outstanding warrants," and "attend[ing] to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015).

11

Here, Brown faults the detectives for taking forty-six minutes before deciding to initially release him after his seizure. But the record establishes that the officers acted in a reasonable manner throughout the stop. *See United States v. Sharpe*, 470 U.S. 675, 687 (1985). Though Detective Frias failed to ask Brown for his identifying information during the first five minutes of the stop, that was justified by Detective Frias's need to wait for Detective Story, who was in charge of running the suspects' information. And that need was itself explained by the police department's reasonable policy that one officer oversees background checks to reduce miscommunications and the risk that something will fall through the cracks. *See McCullers*, 591 F. Supp. 3d at 44 n.9.

The next forty minutes or so of the stop were then explained by Detective Story's need to retrieve his patrol car and run background checks on the four detained suspects and the three firearms that had been seized. True, Detective Story did not spend all that time investigating solely Brown. But a suspect may reasonably be detained while both he and his associates are being investigated. *Cf. Brendlin v. California*, 551 U.S. 249, 258 (2007) (noting that a reasonable "police officer at the scene of a crime, arrest, or investigation will not let people move around in ways that could jeopardize his safety").[9] Officers are often tasked with investigating multiple people at once, and the Constitution does not prohibit

---

[9] The fact that the officers released the two other suspects does nothing to undercut the reasonableness of their decision to continue to detain Brown. As the district court found, the two others were released only a few minutes before the investigation was completed, and the detectives already had a preexisting relationship with the two such that the risk they posed was substantially less than that posed by the unknown Brown. *McCullers*, 591 F. Supp. 3d at 49 n.16.

12

officers from reasonably electing to complete a unified investigation before informing the suspects of the result of that investigation.[10]

Finally, the officers' decision to conduct a brief sweep of the area to ensure that there were no discarded firearms before releasing Brown was a reasonable effort to ensure their safety that did not impermissibly extend the length of the stop. As discussed above, the officers reasonably believed that Brown had been in possession of two firearms just an hour or two before. And before the stop, Brown had acted evasively in walking away after seeing the police. Under these circumstances, the two-and-a-half-minute sweep was patently reasonable.

Accordingly, the length of Brown's stop did not violate his constitutional rights.

\*          \*          \*

For these reasons, the district court's judgment must be

*AFFIRMED.*

---

[10] A contrary rule would put officers in a catch twenty-two since those investigated later could argue that their own detention was unreasonably extended by the time the officers took to stop running information, return to the suspects, and release the person with the good fortune to be the first the officer chose to run through the system.

13

WYNN, Circuit Judge, dissenting:

The Second Amendment secures the individual right of the people to "keep and bear Arms." U.S. Const. amend. II; *see District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). This Court has been explicit that "the exercise of this right, without more, cannot justify an investigatory detention." *United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013).

That right is, of course, subject to important exceptions. *See generally Heller*, 554 U.S. at 626–27. But today, the majority opinion crafts out of whole cloth a new exception to the Second Amendment's protections: the Second Amendment apparently does not protect the individual right to keep and bear arms when an individual lives in an area that is a "hot spot for gang violence." Majority Op. at 8. Relying on its newly created exception, the majority opinion concludes that law enforcement acted within the Constitution's bounds when they detained Anthony Brown and Dequane McCullers.

Neither the Second nor the Fourth Amendments can tolerate such sweeping exceptions to their protections. The Supreme Court has been clear that the Second Amendment is not a "second-class right." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 70 (2022) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion)); *accord Bianchi v. Brown*, _ F.4th _, 2024 WL 3666180, at *35 (4th Cir. Aug. 6, 2024) (Richardson, J., dissenting) ("The Second Amendment is not a second-class right subject to the whimsical discretion of federal judges."). And this Court has similarly been clear that individuals living in so-called "high-crime areas" are not "second-class citizens" or "less worthy of Fourth Amendment protection." *United States v. Curry*, 965 F.3d 313, 331 (4th Cir. 2020) (en banc) (quoting *Utah v. Strieff*, 579 U.S. 232, 252

(2016) (Sotomayor, J., dissenting)). Because the majority opinion relegates both to second-class status, I must respectfully dissent.

## I.

A police officer's suspicion that a person is engaged in criminal activity must be "grounded in specific and articulable facts." *United States v. Moore*, 817 F.2d 1105, 1107 (4th Cir. 1987). Therefore, I start with an overview of the facts known to officers at the time they detained Brown and McCullers.

At around 5:00 A.M. on July 23, 2021, Richmond Police Department Detective Benito Frias viewed a video posted to Instagram by a known gang member, "J.S." Frias encountered the video while monitoring the public social media accounts of known investigative targets in the area, an intelligence-gathering procedure used by the Richmond Police Department. In the 22-second-long video, six individuals could be seen holding what appeared to be firearms in front of the Belt Atlantic apartments, dancing and gesturing with them toward the camera, which J.S. held in the "selfie" style. Although Frias could tell that the video had been posted one to two hours prior to him viewing it, he could not tell from the post when the video was recorded.

Brown and McCullers were in the video, but their identities were unknown to Frias—he registered them only as two men wearing distinctive clothing. Specifically, Brown was wearing a purple jacket; McCullers was wearing a black hat with a white logo as well as brightly colored underwear that was visible above the waistline of his pants.

15

Upon seeing the Instagram video, Frias worked with Detective Jessica Spence to access real-time surveillance footage of the apartment complex.[1] The surveillance footage showed three individuals standing around the complex, one of whom Frias recognized as a person who had appeared in the Instagram video because of his purple jacket (Brown). *United States v. McCullers*, 591 F. Supp. 3d 38, 43 (E.D. Va. 2022). No one in the live footage, including Brown, had a visible firearm, although one individual had a drum magazine visibly tucked into his waistband.[2]

The detectives showed the Instagram video and surveillance footage to Sergeant Brian Rogers and Detective John Story. Even though the real-time surveillance footage showed that the larger group of men who had appeared in the Instagram video had since dispersed and that nobody was now displaying firearms, the officers "geared up" and traveled to the apartments. J.A. 152–53. The trip took them another ten to twenty minutes, during which a detective continued to monitor the surveillance footage, witnessing no criminal activity. *McCullers*, 591 F. Supp. 3d at 43. Upon arriving at the complex, Frias and Rogers split up and approached the apartment from different sides, with Frias ultimately detaining Brown and Rogers ultimately detaining McCullers.

Because the particular facts known to an officer when they engage in a warrantless stop are essential to any Fourth Amendment analysis, and because Brown and McCullers

---

[1] The apartment complex had previously granted Richmond Police access to this footage.

[2] Virginia does not prohibit high-capacity magazines.

16

were apprehended by two different officers with two different perspectives, it is appropriate to consider each man's factual scenario separately from this point forward. *See United States v. Critchfield*, 81 F.4th 390, 394 (4th Cir. 2023).

A.

Upon arriving at the apartment complex, Frias approached through the back gate, recognized Brown and McCullers as individuals who had appeared in the Instagram video, and began walking toward them. As Frias approached the two men, they calmly walked away from him through the apartment breezeway. Frias pursued. By the time he emerged from the breezeway, Frias saw Brown (and only Brown) walking up the stairs of an adjacent apartment building. Prior to this point, Frias had said nothing to Brown or McCullers, but, as Brown climbed the stairs, Frias called out "hey man," "yo," "hey," and "yo" again. J.A. 401, Gov't Ex. 5 (digital media), at 1:25–28. When Brown continued to climb the stairs, Frias commanded him to "stop," identified himself as police for the first time, and ran toward him with his gun drawn. J.A. 401, Gov't Ex. 5 (digital media), at 1:30–34. Upon attaining the stairway landing where Brown was now walking, Frias saw that Brown's hands were "in front of his torso" and told Brown to "stop reaching." *McCullers*, 591 F. Supp. 3d at 43; *see* J.A. 401, Gov't Ex. 5 (digital media), at 1:35. Within six seconds of Frias's first "stop" command, and less than two seconds after Frias identified himself as a police officer, Brown put his hands in the air and turned around. J.A. 401, Gov't Ex. 5 (digital media), at 1:36. Frias approached and handcuffed him.

The police detained Brown for almost an hour before Frias noticed something in Brown's pants, searched him, and found a gun. Once the police ran a background check

17

and learned that Brown had a prior felony conviction, Brown was arrested and indicted for felony possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

## B.

Rogers approached the apartment complex from a different side than Frias. After entering the front gate and running past multiple courtyards, he arrived behind Frias just as Frias began to climb the apartment stairs and shout "stop" at Brown. J.A. 156; J.A. 401, Gov't Ex. 9 (digital media), at 1:50. Rogers continued up the stairs behind Frias and passed him on the second-story landing as Frias was handcuffing Brown. Rogers continued to the third story, where he saw McCullers, ordered him to put his hands up and get on the ground, and handcuffed him. J.A. 157; J.A. 401, Gov't Ex. 9 (digital media), at 2:05–35.

After stopping McCullers, Rogers patted him down and found a pistol. He then asked McCullers if he had ever been convicted of a felony. After McCullers answered that he had been convicted of a felony, Rogers arrested him. Like Brown, McCullers was subsequently indicted for a violation of § 922(g)(1).

Brown and McCullers filed motions to suppress the firearms, arguing that their seizure and subsequent searches violated their Fourth Amendment rights. The district court denied the motions, *McCullers*, 591 F. Supp. 3d at 52, and both men pleaded guilty before timely appealing the denial of their motions to suppress.

## II.

The Fourth Amendment allows a law enforcement officer to detain a person for a brief investigatory stop when the officer "possess[es] 'a reasonable, articulable suspicion

that criminal activity is afoot.'"[3] *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). To establish reasonable suspicion, an officer must "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21 (1968). As such, "it is the *government's* burden to articulate facts sufficient to support reasonable suspicion." *United States v. Burton*, 228 F.3d 524, 528 (4th Cir. 2000) (emphasis added).

The majority opinion's superficial analysis ignores this standard. Our precedent makes clear that the conduct in which Brown and McCullers were engaging in the Instagram video is insufficient to give rise to reasonable suspicion. But, even if we assume *arguendo* that the video could lawfully give rise to any suspicion, that suspicion was quickly dispelled by real-time surveillance footage. Despite this utter lack of basis to suspect criminal activity, officers traveled to the apartment complex to "investigate" further, Majority Op. at 9, and seized Brown and McCullers. These seizures violated their Fourth Amendment rights.

## A.

Brown and McCullers first drew the attention of law enforcement because they appeared in a video posted to Instagram by a person known to officers. In that video, the two men were engaging in conduct this Court has made clear is insufficient to give rise to

---

[3] The parties agree that, at least at their inception, both Brown's and McCullers's seizures should be evaluated as brief investigatory stops pursuant to *Terry v. Ohio*. *See* Opening Br. at 12–13; *see also* Response Br. at 15.

19

reasonable suspicion—openly displaying firearms in a state that permits open carry.[4] *Black*, 707 F.3d at 540 ("[W]here a state permits individuals to openly carry firearms, the exercise of this right, without more, cannot justify an investigatory detention."). And while the two men were exercising that right in an apartment complex with a history of criminal activity and in the presence of a known gang member, we have also been clear that we "refuse to find reasonable suspicion merely by association," *id.*, and that residents of so-called "high-crime area[s]" are no "less worth of Fourth Amendment protection" merely by "virtue of where they live," *Curry*, 965 F.3d at 331. Thus, our precedent makes clear that the Instagram video was insufficient to give rise to reasonable suspicion.

The majority opinion fails to reckon with this precedent. Instead, it resorts to describing the video in the most menacing light possible.

The majority opinion describes the Instagram video as showing a "gang-related brandishing incident" "featuring hand gestures and aggressive posturing with firearms." Majority Op. at 8, 11. And that "aggressive" behavior, the majority opinion asserts, was "meant to communicate a message to members of other gangs in the area." *Id.* at 8. Finally, for good measure, the majority opinion throws in that the actions in the video might constitute a violation of Virginia Code § 18.2-282(A), which provides that it is "unlawful for any person to point, hold or brandish any firearm . . . in such manner as to reasonably induce fear in the mind of another." Va. Code § 18.2-282(A); *see* Majority Op. at 7.

---

[4] Virginia generally allows open carry, and the Government has not argued that any of the statutory exceptions to that default rule, as set forth in Virginia Code § 18.2-287.4, apply here.

To be sure, the district court noted that "detectives had previously observed gang members post inciting videos on social media to goad each other to violence." *McCullers*, 591 F. Supp. 3d at 47. Thus, the district court concluded, the video at issue here was "possibly" meant to provoke opposing gangs. *Id.* at 47 n.14. But the district court failed to compare the video at issue here to those that had been known to incite violence in the past.

And a closer look at the record reveals that it is dubious at best whether the video bore any resemblance to videos that had previously incited violence, at least as those videos were described by detectives. In the proceedings before the district court, the Government explained that "some of these [previous instances of gang violence] were provoked by social media posts where a member of one gang would make implicit or explicit threats to the other, leading to the recipient of the threat to retaliate." J. A. 45. And Detective Spence corroborated this explanation on the stand, testifying that "some people will use [social media] to lure people to the area . . . or they will post video where it is rap videos that are, you know, talking about the people who they are beefing with." J. A. 86.

In other words, while officers testified before the district court that gangs do sometimes make threats on social media, they also indicated that threats tended to be more direct, verbal communications—"talking about the people who they are beefing with." *Id.* The video exhibit in the record does not contain audio, but none of the officers who heard the original audio and later testified about the video suggested that its audio contained inflammatory language or lyrics.

Without any such threatening language to point to, it is not at all clear why it was "reasonable" for officers to conclude that the video was a coded message of incitement,

21

Majority Op. at 8, as opposed to a video of friends dancing along to a song; keeping firearms as a "form of insurance" or a "contingency" should they need to defend themselves or their homes; or merely conveying that they were "prepared in the event of hostile invasion or tyrannical government." *Bianchi*, _ F.4th at _, 2024 WL 3666180, at *61 n.60 (Richardson, J., dissenting).

We have been clear that the Government cannot "us[e] whatever facts are present, no matter how innocent, as indicia of suspicious activity." *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011). But that is precisely what the majority opinion allows the Government to do here. The majority opinion describes activity that we have said is insufficient on its own to give rise to reasonable suspicion—possession of a firearm, mere association with a known criminal, and presence in a so-called high crime area—and credits the Government's assertion that, when combined with dancing and broadcasted on Instagram, that previously insufficiently suspicious behavior is now a clear indication of gang activity.

This uncritical acceptance of the Government's argument opens the door for abuse in future cases. What other innocuous details might the Government add to the mix to claim suspicion? Should individuals who live in high-crime neighborhoods steer clear of exercising their Second Amendment rights while wearing certain colors, lest the Government claim they are trying to summon a rival gang? Is any behavior that takes place in a neighborhood known for gang violence now vulnerable to being deemed indicative of gang activity merely because the Government says it is so?

22

I am especially troubled by the majority opinion's willingness to unquestioningly accept the Government's version of events because I have substantial doubts regarding whether a similar video would have drawn the ire of law enforcement had the video's participants not been young, Black men. Studies have shown that people are more likely to characterize ambiguous behavior as aggressive when evaluating the behavior of a Black person as opposed to a white person and that people are more likely to evaluate the same facial expression as hostile when it appears on a Black person's face. L. Song Richardson, *Police Efficiency and the Fourth Amendment*, 87 Ind. L.J. 1143, 1148–49 (2012) (collecting studies). Similarly, researchers have noted the existence of "attentional bias"—findings that Black people are more likely to draw attention than white people. *Id.* at 1150. Thus, one can plausibly conclude that "implicit biases may cause police officers to pay more attention to Blacks than to Whites and to interpret the behaviors of Blacks as suspicious more readily than the identical behaviors of Whites." *Id.* at 1151; *see also* Megan Quattlebaum, *Let's Get Real: Behavioral Realism, Implicit Bias, and the Reasonable Police Officer*, 14 Stan. J. C.R. & C.L. 1, 11–14 (2018) (collecting studies demonstrating that "[a]n implicit bias that is particularly relevant to racial profiling in policing is the connection many people make between Black people and crime").

This evidence of bias should give courts pause when evaluating the reasonableness of law enforcement actions in situations like the one here. As the Supreme Court has made clear, the Second Amendment protects the right to armed self-defense both in the home and outside of it. *Bruen*, 597 U.S. at 10. As the officers were well aware, there had recently been a deadly shooting in the area—an occurrence that might well give rise to an

23

individual's belief that they needed to exercise their lawful right to self-defense. Yet officers were nevertheless quick to assume that the video's participants were attempting to incite unlawful activity, as opposed to lawfully exercising their rights.

"[T]he success or failure of a suppression motion cannot hinge on an officer saying, in essence, 'I know it when I see it.'" *United States v. Drakeford*, 992 F.3d 255, 267 (4th Cir. 2021) (Wynn, J., concurring). But that "I know it when I see it" attitude is precisely what led to officers scrutinizing the actions of Brown and McCullers. And because implicit bias may influence when a law enforcement officer "sees it," courts should exercise caution when evaluating the reasonableness of an officer's action. The majority opinion's hasty acceptance of the Government's characterization of the video at issue in this case eschews that caution, leaving minority communities vulnerable to harassment by law enforcement and denying them the full exercise of their constitutional rights.

B.

Even if we credit the assertion that the Instagram video warranted some follow-up investigation, that investigation should have employed "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). Here, the least intrusive means available to the officers was to review the surveillance footage, and the notion that that footage *verified* the officers' suspicion strains credulity. In the footage, officers saw no firearms, no rival gangs, and no signs of violence whatsoever: all they saw were a few individuals milling around an apartment complex's common area, at least one to two hours after the Instagram video had been filmed. And while the surveillance footage showed that

24

Brown was standing *near* someone with a drum magazine, surely if "proximity to an individual with a gun" cannot be a basis for reasonable suspicion of criminal activity, *Black*, 707 F.3d at 541, the same must be true for proximity to someone with a magazine.

Once they saw the live footage, any concerns the officers had that gang violence was imminent should have been assuaged—the gang fight the officers feared had clearly not come to pass. Any reasonable suspicion that the Instagram video raised had been dispelled, and officers therefore had no reason to believe that crime was afoot—and especially not any crime that could be particularized to Brown or McCullers.

Accordingly, any investigation that took place after officers viewed the surveillance footage was, at best, investigation into a *completed* violation of Virginia Code § 18.2-282(A).[5] A violation of section 18.2-282(A) that does not occur on school grounds is a misdemeanor, and neither this Court nor the Supreme Court have addressed whether the investigation of a completed misdemeanor may justify an investigatory *Terry* stop. In *United States v. Hensley*, the Supreme Court left unanswered the question of whether "*Terry* stops to investigate all past crimes, however serious, are permitted." *United States v. Hensley*, 469 U.S. 221, 229 (1985). The circuits that have considered this question have

---

[5] It is worth questioning whether the Instagram video reasonably supported a suspected violation of section 18.2-282(A). After all, conduct only constitutes a violation of section 18.2-282(A) if it "reasonably induce[s] fear in the mind of another." Va. Code. § 18.2-282(A). Here, the men in the video were pointing guns at a camera, not at another person, and were doing so while dancing in a group. To conclude that this conduct constituted a violation of the Virginia statute, the majority opinion apparently relies on the existence of some unknown viewer of the video who—despite not being in the same location as the men with guns—nevertheless feared being shot. Majority Op. at 8–9.

25

adopted a balancing test, considering "the nature of the crime, how long ago the suspect committed it, and the ongoing risk of the individual to the public safety." *United States v. Jones*, 953 F.3d 433, 436–37 (6th Cir. 2020) (collecting cases).

The majority opinion entirely fails to mention that the status of section 18.2-282(A) as a misdemeanor offense should factor into our Fourth Amendment analysis. That is likely because if we were to adopt a balancing test to evaluate the reasonableness of a seizure to investigate a completed misdemeanor, the balancing test would favor suppression in this case. Even if the men in the video *had* committed a misdemeanor, the risk to others was low: it was nighttime and the courtyard in which the video was filmed was sparsely populated, with only one person not obviously associated with the group appearing in the background of the video. Moreover, it is impossible to tell when the video was filmed, so there was no way for officers to know how long ago the supposed violation occurred. And, immediately after viewing the video, the officers learned that the firearms were no longer being brandished (or handled at all, for that matter) through what they observed on the real-time surveillance footage. There was therefore no ongoing threat to public safety and no need to engage in a *Terry* stop to investigate a completed misdemeanor.

Thus, because officers were able to dispel any suspicion of criminal activity by observing real-time footage, any arguable misdemeanor violation had long since been completed, and there was no ongoing threat to public safety, there was no need for the officers to travel to the apartment complex for any further investigation. But the officers were determined to, as Frias put it, do "what [they] do all the time: just jump out, see what's going on." J.A. 401, Gov't Ex. 5 (digital media) at 12:30.

26

C.

Nothing the officers saw upon arriving at the apartments verified their suspicions, either. Again, they saw no firearms and no criminal activity. Brown and McCullers did walk away from the officers, but this Court has been clear that an individual's mere departure from the scene does not give rise to a finding of reasonable suspicion. *United States v. Sprinkle*, 106 F.3d 613, 618 (4th Cir. 1997) (holding that while "evasive" conduct may be suggestive of wrongdoing, driving away in a "normal, unhurried fashion" does not weigh in favor of reasonable suspicion). Indeed, any person may decline to engage in a consensual encounter with police officers. *See Royer*, 460 U.S. at 497–98; *Florida v. Bostick*, 501 U.S. 429, 437 (1991) ("[R]efusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.").

The majority opinion disagrees, claiming that "how the defendants acted after officers arrived but before officers seized them" "surely" provides reasonable suspicion because "both men immediately started to leave the area and ignore the officers' commands once the officers approached them." Majority Op. at 10. But when officers first arrived on scene, they did not command that either of the two men stop. Once Frias commanded that Brown stop, he did so within six seconds.[6] And McCullers appeared to comply immediately

---

[6] Neither the Government, nor the district court, nor the majority opinion appear to take the position that Brown's conduct within those six seconds—in which Brown briefly moved his hands in front of his torso before putting them in the air—was independently sufficient to give rise to reasonable suspicion, and for good reason. We declined to find that the defendant's movements in *United States v. Foster* were sufficient to give rise to reasonable suspicion even though the defendant's arms were "going haywire" once he saw police officers. *Foster*, 634 F.3d at 245, 247. And we have repeatedly cautioned against (Continued)

27

with Rogers's commands that he get on the ground and put his hands up. So, the majority opinion faults Brown and McCullers for exercising their right to simply walk away when police arrived on scene.

The majority opinion's position not only violates precedent, it ignores reality. As other jurists have highlighted, it is easy to imagine why young, Black men may choose to avoid engagement with law enforcement. *See Wardlow*, 528 U.S. at 132 (Stevens, J., concurring in part and dissenting in part) ("Among some citizens, particularly minorities and those residing in high crime areas, there is . . . [a] possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous."); *see also Curry*, 965 F.3d at 332 (Gregory, C.J., concurring) ("There's a long history of black and brown communities feeling unsafe in police presence."); *People v. Flores*, 546 P.3d 1114, 1128 (Cal. 2024) (Evans, J., concurring) (explaining that "many individuals—including, particularly, people of color—commonly hold a perception that engaging in any manner with police, including in seemingly casual or innocuous ways, entails a degree of risk to one's safety"). Even a glance at the data on police violence shows that these fears are understandable—police shot and killed at least 2,274 Black men in the last decade alone, and police killed Black Americans at more than

---

"overplay[ing] a suspect's nervous behavior in situations where citizens would normally be expected to be upset." *United States v. Slocumb*, 804 F.3d 677, 683 (4th Cir. 2015) (quoting *United States v. Glover*, 662 F.3d 694, 699 (4th Cir. 2011)). Thus, any momentary gesture was insufficient to transform Brown's otherwise innocent conduct—calmly choosing not to engage with officers—into behavior sufficient to give rise to the requisite suspicion for a *Terry* stop.

28

twice the rate of their white counterparts. *Police Shootings Database*, Wash. Post, https://www.washingtonpost.com/graphics/investigations/police-shootings-database/ [https://perma.cc/Q2VR-MJUU]. To many individuals of color, interacting with police officers—in any capacity, regardless of their innocence—means incurring a risk of injury or death.

With this context, nothing about Brown's or McCullers's reactions to police should have triggered further suspicion. They were merely two people who wanted—for whatever reason—to be left alone. But they were nevertheless followed, and subsequently seized, by officers. Why? Because they appeared in a video, engaging in presumptively lawful conduct, that the Government frames as a coded message broadcasted on social media.[7] As I have explained, that video was insufficient to give rise to reasonable suspicion. But any suspicion the officers did have after seeing the video was assuaged when real-time surveillance—and on-the-scene observations—confirmed that the video's participants

---

[7] I will also note that, because Rogers apparently did not recognize McCullers from the video, J.A. 169, McCullers was seized merely because he was in the same location as the video was filmed. That is plainly insufficient to give rise to reasonable suspicion. *See United States v. Massenburg*, 654 F.3d 480, 487 (4th Cir. 2011) (holding that an anonymous tip, in combination with an individual's presence in the area identified by the tip, does not generate reasonable suspicion). And although the district court relied on the "collective knowledge doctrine" to "impute[]" Frias's recognition of McCullers to Rogers, *McCullers*, 591 F. Supp. 3d at 47 n.13, that doctrine is inapplicable here. The collective knowledge doctrine provides that "when an officer acts on an instruction from another officer, the act is justified if the instructing officer had sufficient information to justify taking such action herself; in this very limited sense, the instructing officer's knowledge is imputed to the acting officer." *Massenburg*, 654 F.3d at 492. But the doctrine does not "apply outside the context of communicated alerts or instructions." *Id.* at 493. And here, Frias never directed Rogers to stop McCullers. Rogers merely overheard Frias commanding *Brown* to stop.

were not engaged in any criminal activity. Because any amount of suspicion had been dispelled by the time Brown and McCullers were seized, their seizure violated the Fourth Amendment and the firearms recovered from their persons should be suppressed.[8]

III.

From the start, the "investigation" into Brown and McCullers was constitutionally suspect. First, they drew attention from law enforcement merely for engaging in presumptively lawful activity—and because they happened to do so in a so-called "high crime" area. Even though real-time surveillance showed no ongoing criminal activity, police still traveled to the apartment complex, determined to catch the video's participants doing *something*. And, even though they saw nothing more than two men trying to calmly remove themselves from a potentially dangerous and unnecessary interaction with law enforcement, officers still stopped and detained Brown and McCullers.

Over a decade ago, this Court warned against the "slow systematic erosion of Fourth Amendment protections for a certain demographic." *Black*, 707 F.3d at 542. Unfortunately, Frias's own statement confirms those fears—as he admitted, "this is what [police] do all the time." J.A. 401, Gov't Ex. 5 (digital media) at 12:30. By refusing to suppress the evidence obtained from the stop at issue in this case, the majority opinion continues down the slow, systematic path of rights erosion. Therefore, I must, respectfully, dissent.

---

[8] Because I conclude that the seizures were unlawful at their inception, I do not reach Brown's argument that his seizure was impermissibly extended, nor McCullers's argument that he was unreasonably frisked.